511 A.2d 777

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Lawrence BAKER, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 21, 1986.

Decided June 23, 1986.

2

Bruce A. Franzel, Philadelphia, for appellant.

Robert B. Lawler, Chief/Appeals Div., Gaele M. Barthold, Chief/Prosecution Appeals, Alan Sacks, Philadelphia, Marion E. MacIntyre, Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

4

## OPINION OF THE COURT

PAPADAKOS, Justice.

Appellant, Lawrence Baker, was found guilty by a jury of murder of the first degree for the killing of Robert Limerick. A sentencing hearing was held as required by 42 Pa.C.S. § 9711[1] and the jury determined that Appellant be sentenced to death.

This case is now before us on automatic appeal pursuant to 42 Pa.C.S. § 9711(h).[2]

The facts of the case are as follows: On the evening of December 25, (Christmas Day) 1979, the victim went to 731 No. 44th Street in Philadelphia, apparently to make an illegal purchase of drugs. The victim was an habitual drug user and he was well known to the occupants of this location. The Commonwealth's sole eyewitness, Janet Fleming, testified at trial that the victim visited this location on Christmas night, 1979, and informed the co-defendant in this case, Bobbie L. Sims, that he (the victim) wanted to purchase "speed." After the victim claimed that he only

1. 42 Pa.C.S. § 9711(a)(1) provides:
   (a) Procedure in jury trials—
   (1) After a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment.

2. 42 Pa.C.S. § 9711(h) provides:
   (h) Review of death sentence.—
   (1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.
   (2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for imposition of a life imprisonment sentence.
   (3) The Supreme Court shall affirm the sentence of death unless it determines that:
   (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
   (ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or
   (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

had $11.00 or $12.00 with him, Bobbie Sims indicated that he thought the victim had more money than that. Sims noticed that the victim was carrying a gun and ordered Janet Fleming to disarm him, and she testified that she did so. After Janet Fleming turned the gun over to Sims, she stated that Appellant came downstairs with a gun and was directed by Sims to "hold his gun" on the victim while Sims conducted a search. Sims removed the victim's wallet, along with checks and other personal papers.

Janet Fleming admitted that she and another woman, identified only as Vanessa, wrapped the victim's wallet, checks and personal papers in his own coat and took them upstairs. While upstairs in the company of Cookie Brown (also known as Juanita Peck) and her teenage son, Walter Brown (neither of whom were called as witnesses at the trial by either side),[3] they heard a shot. Walter Brown went downstairs and a second shot was heard. The second shot hit Walter Brown in the arm. Janet Fleming (along with at least one other person) followed Walter Brown downstairs and saw the victim tied up at this point and lying on his stomach, with his hands behind his back and blood about his head and face. Appellant and co-defendant Sims then led the victim into the living room, both threatening that if he didn't "shut up" they would shoot him. When the victim refused to be quiet (he kept screaming), Appellant said, "I'm asking one more time to be quiet and if you don't, I'm going to blow your brains out"; he then shot the

---

3. Although the issue has not been preserved on appeal, Appellant alleged that trial counsel was ineffective in failing to locate and call Walter Brown as a witness for the defense. Brown was present at the time of the shooting and was, in fact, shot and wounded himself.

Brown testified at the preliminary hearing for Appellant at which time he indicated that he had been coerced by the police into identifying Appellant as one of the participants in the crime. Brown also indicated that he knew Appellant prior to the incident and did not see him at the scene.

At the evidentiary hearing held by order of this Court after trial, trial counsel stated that he was aware of Brown's testimony at the Preliminary Hearing but was nevertheless reluctant to call him at trial because Brown had given a prior statement to the police which implicated Appellant. (N.T. 3/13/84, pp. 84–85).

victim once, and the victim then jumped through a window in an effort to escape. A police officer found the victim on a porch outside of the house near a broken window, surrounded by broken glass. The victim died of a single gunshot wound and head injuries.

There is substantial corroborating testimony in the record that links co-defendant, Bobbie Sims, with this killing. Marcelle Hannibal, who lived nearby with one Carl Davis, testified for the Commonwealth that Bobbie Sims came to her home on the Christmas night in question and admitted "that he [Sims] had shot somebody...." "He said that he had shot some guy and he had jumped through the window." She testified that Sims returned to the scene of the crime with Mr. Davis to demonstrate that his boast or brag was not an idle one.

Marie Hilyard testified for the Commonwealth that within a week of the killing, Bobbie Sims admitted to her that the victim had come to the house in question looking for drugs, and that "they" (Sims and another person) tied him up, took his checks, identification and a gun, and then shot him. During direct examination by the Assistant District Attorney, in response to the question, "Who stuck him up and who tied him up?" (which was asked in connection with what Sims had admitted to the witness), Ms. Hilyard responded: "Bobbie and Lonnie" [Appellant Baker's nickname]. This hearsay statement was objected to by Appellant's trial counsel, and the court sustained the objection and gave a cautionary instruction to the jury to disregard the reference to Appellant. The fact that the jury heard this response prompted Appellant's trial counsel to move for a mistrial, which was denied. The point has been preserved on this appeal and is discussed below.

On January 7, 1980, co-defendant, Bobbie Sims, attempted to pay for a used car with a $1,000.00 check payable to the victim. On the evening of January 7, 1980, someone, whom Bobbie Sims identified as his sister, gave a $400.00 check, payable to the victim, to an oil company delivery man as payment for a $130.00 bill. The delivery man could not

change the check but took it with him, and the next day Sims himself went to the offices of the fuel oil company to get change for the check where he was apprehended by the police and taken in for questioning. When apprehended, Sims was in possession of a wallet that contained thirty items of identification belonging to the victim. He was, nevertheless, not charged with murder at that time because of insufficient evidence. At trial, Sims admitted to the incidents of January 7 and 8, 1980, but claimed that he received the items in question from Janet Fleming and denied any involvement in the killing.[4]

The only competent evidence introduced at trial connecting Appellant with the killing was the testimony of Janet Fleming.

Warrants of arrest were issued against Appellant and Bobbie Sims on March 28, 1981. Appellant was arrested on April 7, 1981, and Sims on April 16, 1981. On September 1, 1981, the Honorable Paul Ribner denied a number of pre-trial motions, including a motion to sever the trial of the two defendants, and a motion by Appellant's court-appointed counsel, David Zwanetz, to withdraw from the case. Both of these motions were renewed more than once at later stages of the proceedings and were rejected by the Honorable Albert F. Sabo, who presided at trial.

Judge Sabo held a suppression hearing on September 14 and 15, 1981, and jury selection commenced on September 16, 1981. During the course of the voir dire, three venirepersons were excused for cause because they expressed their inability to impose the death penalty. Appellant argues that their dismissal for cause violated *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *rehearing denied*, 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968). This argument is discussed below.

During the trial court's opening statement to the jury panel, and during the initial selection of jury members (on

4. The Commonwealth's brief on appeal incorrectly states (more than once) that Sims attempted to negotiate the checks in January, *1981*, (see Commonwealth's brief, pp. 2–3, 12).

September 16, 23 and 24, 1981), during which time five jurors who ultimately sat during the trial were picked, Appellant was present in the courtroom and was dressed in blue-colored clothing that appeared to be ordinary dungarees. Appellant subsequently wore civilian clothes. Motions to disqualify the five jurors already selected were denied. Appellant complained that he had been wearing prison garb in the presence of these five jurors, but Judge Sabo could not find any descriptive feature of these dungarees which could identify them to the jurors as prison garb. The trial court agreed to allow the jurors to be interrogated concerning their observations of Appellant's clothing at the completion of the jury selection; however, the matter was not raised at that time (possibly because to do so would have unduly emphasized the issue). The point has, however, been preserved for review by this Court.

The essential testimony offered at trial has already been summarized. The Commonwealth's case against Appellant rested solely on the testimony of Janet Fleming, an alleged accessory to the crime, who was given immunity to testify by the Commonwealth. The jury was specifically instructed by the Court that if Janet Fleming was found by them to be an accomplice, her testimony should be looked upon with disfavor because it came from a corrupt and polluted source, and that her testimony had to be examined closely, and only accepted with caution and care. Janet Fleming had a past criminal record. She admitted to using drugs illegally three times a day since the age of 17, to having used drugs ("monster") on the night of the killing, and to having had intimate relations with co-defendant Sims on a number of occasions during the five years prior to the killing. A review of the transcript of her testimony shows it to be somewhat confusing in spots, especially on cross-examination. Portions of her prior consistent statement given to the police in June, 1981, were read into the record by the Assistant District Attorney on re-direct examination.

The jury was obviously aware of the critical nature of Janet Fleming's testimony because, during their delibera-

tions on the guilt or innocence of the defendants, they asked that a written copy of her testimony be given to them. The trial court had most of her testimony, including cross-examination and re-direct, read to the jury (with a small portion played by recording tape because it had not yet been transcribed).

Both defendants testified on their own behalf at trial and each offered an alibi defense. Appellant admitted being in the house in question on the evening of the killing in order to buy "monster" or "speed," but claimed that he left well before seeing the victim come there. He admitted only to using drugs there on that evening and then returning home. Co-defendant Sims denied being there at all on the night in question and his alibi was supported by testimony presented by his sister.

Late in the afternoon of Saturday, October 10, 1981, the jury returned verdicts against both Appellant and co-defendant Sims, finding each one guilty of murder of the first degree, robbery and criminal conspiracy. The sentencing phase of the trial commenced immediately thereafter.

The Commonwealth rested after presenting evidence of Appellant's two prior robbery convictions in 1973 and 1974. Aside from presenting evidence of the co-defendant's birthdate (there was some question as to whether it was March 21, 1954 or 1951),[5] counsel for neither defendant presented any evidence or testimony of a mitigating nature whatsoever to the sentencing jury. Failure of Appellant's trial counsel to present evidence of mitigating circumstances is claimed as evidence of ineffective assistance of counsel in Appellant's brief to us.

In his closing comments to the sentencing jury, Appellant's trial counsel *listed* various mitigating factors that the jury might consider, including the fact that the killer might have been under extreme or emotional disturbance; and he pointed out that Appellant had testified that he had been at the house in question prior to the killing and had taken

5. Appellant had testified earlier that he was 32 years old. See N.T. Trial, pp. 1365–71.

drugs, that he had acted at another person's directions (*i.e.,* Sims'), and that he was probably in a state of hysteria. He pointed out that the jury could "find almost any basis" on which to mitigate the sentence, and he argued that television, the media, and society were somehow to blame where some people are deprived and yet told that if they don't have various consumer goods, they are "not as good as the next fellow." Appellant's trial counsel also pointed out to the jury, over objection, that if, in three years, a mistake were made, and the Appellant executed, the mistake could not be rectified. Sims' trial counsel argued very briefly, but in reference to the prior argument, in the same vein to the effect that, "Your decision is final. There is no appeal and I would ask you to give him a chance and think about everything that we have said." [6]

The Assistant District Attorney began his argument to the jury by attempting to minimize their expectations that a verdict of death would ever be actually carried out, and hence minimized their sense of responsibility for a verdict of death—suggesting that ultimate responsibility rested with this Court. He stated: "You get an appeal after appeal after appeal after appeal, if you think the Supreme Court is going to let anybody get executed until they're absolutely sure that that man has a fair trial, make no mistake about that." [7]

Appellant contends that the Assistant District Attorney's comments constitute reversible error with respect to the imposition of the death penalty under *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The point is fully discussed below.

The jury retired at 5:44 p.m., on October 10, 1981, to consider the appropriate sentences for the defendants after the court instructed them on aggravating and mitigating circumstances, and after they had received three-page ver-

6. This quote is set forth out of context at p. 33 of the Commonwealth's brief.

7. A fuller excerpt from the Assistant District Attorney's comments is set forth below.

dict slips for each defendant which listed the statutory aggravating and mitigating circumstances. At 9:40 p.m., that evening, the jury foreman sent a note to Judge Sabo that they were hopelessly deadlocked. Judge Sabo did not discharge the jury, nor did he directly and immediately inform counsel. The jury apparently continued its deliberations on Sunday morning, October 11, 1981, prior to the time that counsel were fully assembled in the court's chambers at 1:30 p.m. At this time, Judge Sabo denied motions to dismiss the jury and fix the sentences at life imprisonment, as well as motions to give the jury additional instructions. He justified his refusal to dismiss on the grounds that the jury had had only one hour to deliberate the previous night (allowing two hours for dinner). Meanwhile, the jury, continuing to deliberate, had sent Judge Sabo a question asking, "Must you consider aggravating and mitigating circumstances to reach the decision of life imprisonment? May we have a yes or no answer?" The Assistant District Attorney, after initial reluctance, apparently concluded that the jury was leaning against his position because he came around to agree with Judge Sabo's view that the question should be answered "yes." Judge Sabo gave the jury the answer "yes."

At 4:38 p.m., on October 11, 1981, the jury returned a verdict of death against Appellant, and a verdict of life imprisonment against Bobbie Sims. The jury found two aggravating circumstances in the case of Appellant; namely, that the killing was committed while in the perpetration of a felony, and that there was a significant history of felony convictions involving the use or threat of violence to the person. No mitigating circumstances were found.

Imposition of formal sentencing was deferred pending post-verdict motions. Pre-sentence and psychiatric examinations were ordered.

On October 19, 1981, timely motions for a new trial and in arrest of judgment were filed by trial counsel for both defendants. Following the submission of briefs and oral argument, Judge Sabo denied the post-verdict motions on

December 23, 1982. On January 18, 1983, after Appellant advised the trial court of his desire to raise various issues alleging ineffective assistance of counsel, present counsel was appointed to represent Appellant. Following a review of the trial record, an amended motion for new trial and/or arrest of judgment was filed on May 3, 1983. On May 23, 1983, counsel for Appellant and the Commonwealth appeared before Judge Sabo ready to proceed with a hearing on the amended post-trial motions. The trial court refused to hold a hearing or consider the amended post-verdict motions unless they were titled and filed pursuant to the Post-Conviction Hearing Act. Over the objection of counsel, the court moved directly to sentencing of the Appellant without holding a hearing or considering the issues raised in the amended motion for new trial and/or arrest of judgment. Appellant was sentenced to death for first degree murder; to ten to twenty years' incarceration for robbery to run consecutively to the sentence of death; and to five to ten years' incarceration for criminal conspiracy to run consecutively to both of the previous sentences.

A timely Notice of Appeal was filed to this Court on June 10, 1983, from the sentence imposed on May 23, 1983. On September 26, 1983, the Commonwealth filed with this Court a Petition to Remand for an Evidentiary Hearing on the amended post-verdict motions which had been filed by defense counsel. This Petition was joined by counsel for Appellant and, on October 17, 1983, this Court entered an Order remanding the record to the trial court "for an evidentiary hearing on post-verdict motions." An evidentiary hearing was held before Judge Sabo on March 13 and March 15, 1984, on the amended post-verdict motions, and oral argument was presented on March 21, 1984.

On April 11, 1984, Judge Sabo entered an order denying Appellant's requested relief and a Supplemental Opinion and Order was issued on February 15, 1985, which rejected, *inter alia,* five of the six arguments Appellant now presents to this Court. The question concerning one witness making reference before the jury to an admission by

co-defendant Sims that both he and Appellant had robbed the victim was not addressed in Judge Sabo's Supplemental Opinion and Order.

## Sufficiency of the Evidence

■ We have carefully reviewed the record in this case and conclude that there is substantial evidence to convict Appellant of the crimes charged beyond a reasonable doubt. Appellant's convictions depend almost entirely upon belief in the credibility of a single uncorroborated witness, who was most likely an accomplice, Janet Fleming. Credibility questions are for the jury. If the jury believed this witness, as they obviously did, then we are bound by that determination where it was not wholly unreasonable for them to do so. *Commonwealth v. Bubna*, 357 Pa. 51, 53 A.2d 104 (1947).

Appellant presents six arguments in his current appeal to this Court which we next consider.

## I

■ Appellant first argues that his motion for a mistrial was improperly denied or that trial counsel was ineffective in failing to object *ab initio* to his appearance in prison garb during the initial stages of jury selection. After five jurors had been selected, it was brought to the attention of the trial court that co-defendant Bobbie Sims was not dressed in the civilian clothing that had been provided for him. A discussion then ensued concerning Sims' decision to forego wearing civilian clothes during the jury selection. At the conclusion of this discussion, Appellant raised the issue of his own clothing for the first time. Judge Sabo then rendered his own observation that Appellant's blue-colored clothing did not appear to be prison-issue, but rather ordinary dungarees. Trial counsel subsequently moved to disqualify the five jurors that had already been selected. Upon denial of this motion, counsel requested that the jurors be interrogated concerning their observations of Appellant's clothing. The trial court agreed to allow the jurors to be questioned at the completion of jury selection,

but as already noted, the matter was never brought up again.

The law is clear that a state cannot, consistent with the Fourteenth Amendment, *compel* an accused to stand trial before a jury while dressed in identifiable prison clothing. *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). The trial court here clearly did not order Appellant to stand trial in prison garb. He was afforded every opportunity to wear civilian clothing during the trial. The garments he elected to wear during the initial stage of jury selection were, in Judge Sabo's view, not readily identifiable as prison clothing. At the Evidentiary Hearing ordered by this Court, trial counsel testified that while Appellant's clothing *seemed* to be institutional-type, there was something about them that did not upset him for the first few days of the trial. Under these circumstances, Judge Sabo stated that he was convinced that Appellant suffered no prejudice as a result of the clothing he was wearing.

After a careful review of the record, we conclude that there is no significant evidence suggesting that Appellant was in any way prejudiced by what occurred here; and that on the basis of Judge Sabo's direct observations and findings that it is clear beyond a reasonable doubt that Appellant was not so prejudiced.

## II

At trial, the Commonwealth called Marie Hilyard who testified that sometime within a week of this homicide she had a conversation with co-defendant Bobby Sims during which he admitted his participation in this crime. During direct examination by the Assistant District Attorney, Ms. Hilyard told the jury that Sims told her that he and "Lonnie [Appellant Baker]" had robbed the victim and tied him up. This statement was objected to by counsel for Appellant but a motion for a mistrial was denied by the trial court. The court did give a strong cautionary instruction to the jury however, directing them to disregard "what the witness said as to any inference as to Lawrence Baker." Both the

Court and the Commonwealth apparently acknowledged at trial that this statement of co-defendant Sims implicating Appellant did not fall within an exception to the hearsay rule. The Commonwealth now argues that the statement was admissible under the co-conspirator exception to the hearsay rule and cites *United States v. Sears*, 663 F.2d 896 (9th Cir.1981), *cert. denied sub nom., Werner v. United States*, 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982), in support of its position.

Appellant argues that he has been deprived of his right of confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Pennsylvania Constitution and cites *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Commonwealth v. McDowell*, 460 Pa. 474, 333 A.2d 872 (1975); and *Commonwealth v. Ransom*, 446 Pa. 457, 288 A.2d 762 (1972), in support of his argument.

In *Bruton*, the United States Supreme Court held that the admission of a co-defendant's confession to a postal inspector (both defendants had been convicted of armed postal robbery in Federal Court) that implicated defendant at a joint trial constituted prejudicial error, and violated defendant's rights to confront a witness under the Sixth and Fourteenth Amendments to the United States Constitution, even though the trial court strongly instructed the jury to disregard the statement with respect to the defendant. *Ransom* and *McDowell, supra,* come to essentially the same conclusion under similar factual circumstances. However, in *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971), the United States Supreme Court held that where a co-defendant in a state court trial took the stand at a joint trial in his own defense, and denied making an alleged out-of-court statement implicating defendant, and proceeded to testify favorably to defendant concerning the underlying facts, the defendant was denied no rights under the Sixth or Fourteenth Amendments, despite the contention that effective confrontation was possible only if co-defendant had affirmed the statement. Indeed, it was

determined that the co-defendant's testimony at trial was more favorable to defendant than any that cross-examination by counsel could possibly have produced. 402 U.S. at 629, 91 S.Ct. at 1727, 29 L.Ed.2d at 228. *Bruton, supra,* was found inapplicable.

■ The relevant facts in the instant case are, of course, virtually identical to those in *Nelson v. O'Neil, supra.* It is hard to see how Bobbie Sims' complete denial of any involvement in the crime in question and denial that he made the admission in question to Ms. Hilyard could have been any less favorable to Appellant than a denial of the admission produced by cross-examination. On this basis, we conclude that Appellant's rights to confrontation under the Federal and Pennsylvania Constitutions were not violated, and that any prejudicial error which may have occurred was rendered harmless when co-defendant Sims took the stand and testified as he did.

### III

■ Citing Section 5.8(d) of the ABA Standards dealing with a prosecutor's duty to confine his closing remarks to the guilt or innocence of the accused, Appellant next contends that the following remarks made by the Assistant District Attorney to the jury prior to their determining the guilt or innocence of the defendants (while not inaccurate) were improper and prejudicial and that trial counsel was ineffective in failing to object thereto:

> You are what makes the justice system work, ladies and gentlemen. That's the power of the jury. It is the final—and, to an extent, but only to an extent after listening to all of the evidence, the arguments, that you acquit the defendants, that they walk out.
>
> Gone. That is final. Never again. This case this trial, never again. This incident gone from the memory of them, or perhaps it may not, but, at any rate, it's gone. If you are to convict the defendant, then, of course, there will be an appeal and then, after the appeal, any kind of motions and so forth and so on, and possibly if they were

not affirmed, they would be reversed for a new trial. So, to that extent, there is some finality.

However, the fact of the matter is that if you decide and if you acquit these defendants, there is nothing anybody can do about it from then on because that is final. Whereas, if you convict, of course, the possibility of reversal which—why am I saying this? I'm letting you know the power of the jury.

Appellant contends that the purpose of the comments was to cause the jury to err, if they did err, on the side of conviction. The Commonwealth contends that the comments in question were invited by Appellant's trial counsel's prior summation to the following effect:

So, this is my only opportunity and I am going to tell you as you sit in this box, and you go out there and deliberate, this will be your only opportunity. *You won't have the luxury of being able to correct any other errors.* You will not be able to go home and say, gee, if I can only do that over again, you know, I'll be thinking about something that came to my mind that would have changed my feelings. It would have changed my thought; it would have changed completely. You will not be able to do that.

You're going to have to live with what you do in this case for the rest of your lives.

ASSISTANT DISTRICT ATTORNEY: Objection, Your Honor.

THE COURT: Don't comment on that, please.

I'll let you answer that.

Go ahead. (*Emphasis added.*)

Even where the language of a prosecutor is "intemperate, uncalled for, and improper, a new trial is not required unless 'its unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict.'" *Commonwealth v. Burton,* 491 Pa. 13, 22, 417 A.2d 611, 615 (1980), *quoting, Commonwealth v. Stoltzfus,* 462 Pa. 43, 61, 337 A.2d 873, 882 (1975).

We have made a careful review of the record and are unable to find any instances where the Assistant District Attorney attempted to draw any improper inferences or insinuations. Moreover, we note that several times during the course of the trial, the jury was clearly and succinctly instructed by the trial judge that nothing said by the prosecuting attorney or defense counsel could be considered as evidence. Since the remarks complained of were not such as would require a new trial, counsel could not be considered ineffective in failing to object.

## IV

■ Appellant next argues that the trial court committed error when three venirepersons were challenged and excluded for cause because they expressed a complete objection to the death penalty. Specifically, Appellant claims that the court violated the standard set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which established a rule of law that limited venirepersons who could be excluded from a jury considering the death penalty to the following:

> Nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

*Id.*, at 522–523, 88 S.Ct. at 1776–1777. The three individuals who were excused for cause clearly could not have imposed the death penalty and, as such, were properly excused under the law of *Witherspoon*. Moreover, the United States Supreme Court in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), recently stated the following:

We therefore take this opportunity to clarify our decision in *Witherspoon* and to reaffirm the above quoted standard from *Adams* [*v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)] as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that in addition to dispensing with *Witherspoon's* reference to "automatic" decision making, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity."

*Id.* 105 S.Ct. at 852.

In the instant case, venireperson Sylvia Jackson when questioned by the Court said:

Q. Well, are you saying to me that you are against the death penalty?

A. (Nods head affirmatively.) Yes.

Q. Is that what you're saying?

A. Yes.

Q. In other words, you could not even impose a death penalty?

A. No. I'm against the death penalty.

Q. You are against the death penalty?

A. Yes.

THE COURT: All right. You're excused. Thank you very much. (Whereupon the venireperson was excused.)

After some hesitation, venireperson Henrietta Nicolo when questioned by the Court said:

BY THE COURT: In other words, you are saying to me, that you are opposed to it. You are against the death penalty. That you could never vote for the imposition of the death penalty?

A. That's right.

Q. Is that right?

A. Yes, sir.

THE COURT: All right. You are excused.

Likewise, venireperson Myra P. Davis when questioned by the Court said:

A. It would be very difficult. I don't think so. Really. I don't think I could agree to a death penalty. I don't think that I could do that.

Q. You don't know, do you?

A. (Shakes head negatively.) The way I feel now, I'd say no.

BY ASSISTANT DISTRICT ATTORNEY: Challenge for cause, Your Honor.

[Venireperson excused.]

We conclude that under both *Witherspoon* and *Wainwright v. Witt,* exclusion of these three venirepersons was entirely correct and proper.

## V

■ Appellant contends that the sentence of death must be set aside here because the Assistant District Attorney argued to the jury that the ultimate responsibility for determining the appropriateness of a death sentence rested with the appellate courts (rather than with the jury), and that trial counsel was ineffective in failing to object to the argument. Appellant's contention is based on the recent decision of the United States Supreme Court in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

The Assistant District Attorney's comments to which Appellant objects attempted to minimize the jury's sense of responsibility for a verdict of death and to minimize their expectations that such a verdict would ever be carried out, as follows:

Let me give you an example when I say capital punishment and the rights of the individual. The last person that was executed in this state was Elmo Smith and his crime was in 1959; Mary Anne Mitchell in 1959, in Manyunk. Remember it? Well, it was in the newspapers. He was the last person that was executed in 1963. *You get an appeal after appeal after appeal, if you think*

*the Supreme Court is going to let anybody get executed
until they're absolutely sure that that man has a fair
trial make no mistake about that.* I'm not going to go
any further.

I just want you to understand that once you leave, that
this man is not going to have the switch pulled in a
matter of hours. That just doesn't happen. It goes on
and on and on. I'm not going to sit here and tell you
what the system is all about. (*Emphasis added.*)

At the end of his summation, the Assistant District Attor-
ney returned to the same theme:

... but just understand this, no matter what your deci-
sion is, ladies and gentlemen, it will be and I can assure
you as much as I am standing here right now, there will
be considerable time and considerable appeals to be be-
fore any kind of finality occurs in this particular action.

In *Caldwell v. Mississippi, supra,* the United States
Supreme Court determined that a sentence of death entered
in a state court is impermissible under the Eighth Amend-
ment to the United States Constitution when the sentencing
jury has been led to believe that responsibility for determin-
ing the appropriateness of defendant's death rests not with
the jury, but with the appellate court which later reviews
the case. Determining that such an argument renders the
capital sentencing proceeding inconsistent with the Eighth
Amendment's heightened need for reliability in the determi-
nation that death is the appropriate punishment in a specific
case, the United States Supreme Court vacated the death
sentence.

The Supreme Court recognized four specific reasons to
fear both substantial unreliability and bias in favor of death
sentences where there are "state-induced suggestions that
the sentencing jury may shift its sense of responsibility to
an appellate court." *Caldwell, supra,* at 105 S.Ct. 2640.
The Court recognized that bias against defendant in the
sentencing determination may arise from the fact that:

1) ... [there are] institutional limits on what an appellate
court can do—limits that jurors often might not under-

stand. The "delegation of sentencing responsibility that the prosecutor here encouraged would thus not simply postpone the defendant's right to a fair determination of the appropriateness of his death; rather it would deprive him of that right, for an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance. Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record. This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed "[those] compassionate or mitigating factors stemming from the diverse frailties of humankind." [*Woodson v. North Carolina*, 428 U.S. 280, at 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, at 961 (1976) (plurality opinion).] When we held that a defendant has a constitutional right to the consideration of such factors, [*Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion)], we clearly envisioned that the consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses. As the dissenters below noted [in *Caldwell*], "The [mercy] plea is made directly to the jury as only they may impose the death sentence. Under our standards of appellate review mercy is irrelevant. There is no appellate mercy. Therefore, the fact that review is mandated is irrelevant to the thought processes required to find that an accused should be denied mercy and sentenced to die." [*Caldwell v. State,*] 443 So.2d [806], at 817 [ (Miss.1983) ] (Lee, J. dissenting) ...

2) ... Even when a sentencing jury is unconvinced that death is the appropriate punishment, it might nevertheless wish to "send a message" of extreme disapproval for the defendant's acts. This desire might make the jury very receptive to the prosecutor's assurance that it can more freely "err because the error may be corrected on appeal." *Maggio v. Williams*, 464 U.S. 46, 54–55, 104

S.Ct. 311, 316, 78 L.Ed.2d 43 (1983) (Stevens, J., concurring in judgment). A defendant might thus be executed, although no sentencer had ever made a determination that death was the appropriate sentence.

3) ... some jurors may correctly assume that a sentence of life in prison could not be increased to a death sentence on appeal.... The chance that this will be the assumption of at least some jurors is increased by the fact that, in an argument like the one in this case, appellate review is only raised as an issue with respect to the reviewability of a death sentence. If the jury understands that only a death sentence will be reviewed, it will also understand that any decision to "delegate" responsibility for sentencing can only be effectuated by returning that sentence. But for a sentencer to impose a death sentence out of a desire to avoid responsibility for its decision presents the spectre of the imposition of death based on a factor wholly irrelevant to legitimate sentencing concerns. The death that would emerge from such a sentencing proceeding would simply not represent a decision that the State had demonstrated the appropriateness of the defendant's death. This would thus also create the danger of a defendant being executed in the absence of any determination that death was the appropriate punishment. [footnote omitted.]

4) ... [the prosecutor's] argument offers jurors a view of their role which might frequently be highly attractive. A capital sentencing jury is made up of individuals placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice. They are confronted with evidence and argument on the issue of whether another should die, and they are asked to decide that issue on behalf of the community. Moreover, they are given only partial guidance as to how their judgment should be exercised, leaving them with substantial discretion. Given such a situation, the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the impor-

tance of its role. ·Indeed, one can easily imagine that in a case in which the jury is divided on the proper sentence, the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in.

This problem is especially serious when the jury is told that the alternative decision makers are the justices of the state supreme court. It is certainly plausible to believe that many jurors will be tempted to view these respected legal authorities as having more of a "right" to make such an important decision than has the jury. Given that the sentence will be subject to a appellate review only if the jury returns a sentence of death, the chance that an invitation to rely on that review will generate a bias toward returning a death sentence is simply too great.

105 S.Ct. at 2640–2644.

The Assistant District Attorney's comments in the instant case were easily susceptible of being viewed as an encouragement to "send a message" to the appellate courts about the jury's disapproval of appellate delay generally in enforcing the death penalty, or of Appellant's acts in particular. Moreover, this was a jury that was divided on the proper sentences to impose. They first reported that they were hopelessly deadlocked,[8] and then later asked if aggravating and mitigating circumstances had to be weighed in considering life imprisonment (see above). There is the significant possibility here that reluctant jurors were persuaded to give

8. While the issue has not been raised on appeal, and we feel no need to address it since for other reasons the death sentence in this case must be reduced to life imprisonment without parole, we are nevertheless troubled that when the jury returned hopelessly deadlocked here, counsel were not immediately summoned, and that the decision to send the jury back for further deliberations was made without prior consultation with counsel. It is now axiomatic that a criminal defendant must be effectively represented by counsel at all critical stages of the proceeding. See, *Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). That requirement was not met here. Defense counsel *might* have been persuasive in convincing the trial court that further deliberations were unwarranted. See, 42 Pa.C.S.A. § 9711(c)(1)(v). Defense counsel *might* also have argued that special

in because of the argument that the Supreme Court of this Commonwealth would review the matter.[9]

We conclude that the inherent bias and prejudice to Appellant engendered by the Assistant District Attorney's remarks necessitates reversal of the death sentence in the instant case, and that under the circumstances said remarks also violated Appellant's rights under the Eighth Amendment of the United States Constitution as set forth in *Caldwell v. Mississippi, supra,* as well as violating Appellant's rights under Article I, § 13, of the Constitution of the Commonwealth of Pennsylvania.[10]

█ The Commonwealth advances two arguments against the conclusion that the Assistant District Attorney's comments were so prejudicial that the instant death sentence must be vacated, and a sentence of life imprisonment imposed. First, the Commonwealth argues that both defense attorneys made such outrageous, erroneous and gut-wrenching arguments that they invited the Assistant District Attorney's comments. This argument is completely without merit. First, it is clear from a review of the record that Appellant's trial counsel did not invite the Assistant District Attorney's improper response. The comments of defense counsel complained of are as follows:

APPELLANT'S COUNSEL: But, let's assume that as certain as you are that somehow, three years later some-

instructions had to be given to a hopelessly deadlocked jury informing them that if an unanimous death verdict could not be reached, that defendant would be sentenced to life imprisonment without parole. See, *State v. Williams,* 392 So.2d, 619 (La.1980). Defense counsel could not effectively present such arguments where the decision was already made.

9. In *Caldwell,* the Supreme Court also notes that most legal authorities had already strongly condemned the sort of prosecutorial argument under discussion and that Court cites a number of earlier precedent from state Supreme Courts. See, *Caldwell,* 105 S.Ct. at 2642, n. 4.

10. Appellant's argument cannot be considered waived because of trial counsel's failure to object to the Assistant District Attorney's comments. A limited relaxation of the waiver rules exists in death penalty cases and that doctrine must apply here. *Commonwealth v. Holcomb,* 508 Pa. 425, 498 A.2d 833 (1985). Hence, we need not specifically rule on Appellant's contention that trial counsel was ineffective in not objecting to the Assistant District Attorney's comments.

thing develops and you read in the newspaper that you made a mistake because you did it on the basis of what you heard today—

ASSISTANT DISTRICT ATTORNEY: Your Honor, I object to that.

THE COURT: Yes, let's stick to the aggravating and mitigating circumstances, please.

There are plenty of safeguards in the law, now, please.

APPELLANT'S COUNSEL: There are no safeguards in the law if the defendant is executed, and I ask you not to become his executioner.

Now, there are safeguards in the law if the person is alive and if that person is living at the time, and if there is a mistake, we can rectify that. But, you can't rectify someone's life.

ASSISTANT DISTRICT ATTORNEY: Objection, Sir.

APPELLANT'S COUNSEL: I would ask you to find that there is noted mitigation in this case and not be an executioner in the process, which is final, from which there is no return.

Counsel for co-defendant Sims told the jury, "Your decision is final. There is no appeal."

It is ironic that the Assistant District Attorney, who had previously emphasized the finality of an acquittal to the jury, here reacted so strenuously to comments about the finality of an execution. Be that as it may, the comments on the finality of an execution and that no safeguards exist once a person is executed can hardly be said to be untrue, although they should not have been made even in a circumstance such as this one, where the jury was being cautioned to use care and to give the defendants the benefit of every doubt. These comments did emphasize (albeit, improperly) the requirement that the jury take its responsibilities very seriously.

A careful review of Sims' counsel's comments shows that, in context, they were merely supportive of Appellant's trial counsel's immediately preceding comments about the finality of an execution. There is nothing here that justified or

invited the Assistant District Attorney's references to the appeals process that would follow. If the Assistant District Attorney's statements could be said to have been made in response to improper comments by defense counsel, and that defense counsels' arguments invited error, they did not invite *this* error. The Court in *Caldwell, supra,* rejecting a similar argument of error invited by allegedly outrageous or gut-renching remarks, quoted with approval the statement by the dissenting justices on the Mississippi Supreme Court in *Caldwell* dealing with the need for a rational relationship between the original remarks and the prosecutor's response to the effect that: "Asking the jury to show mercy does not invite comment on the system of appellate review." 105 S.Ct. at 2644, quoting 443 So.2d at 817. We find, therefore, that the Commonwealth's first argument against applying *Caldwell* to this case must fail, and that there was no excuse for the Assistant District Attorney making the seriously prejudicial remarks that he did.

■ Second, the Commonwealth argues that since no mitigating evidence was presented on behalf of Appellant at the sentencing phase of the trial, that even if erroneous, the error was harmless since under our statute, "the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance...." 42 Pa.C.S.A. § 9711(c)(1)(iv). The argument is disingenious at best, and must fail. The jury could have found here a mitigating *circumstance* or mitigating *circumstances* under the broad language of our statute, based on the evidence at trial itself, and based on Appellant's counsel's summation to the jury before their sentencing deliberations. Appellant's trial counsel pointed out to the jury that Appellant had admitted to having taken drugs on the night of the killing; that he had taken orders from co-defendant Sims; that he may have been emotionally disturbed or hysterical; and trial counsel argued that Appellant had been deprived of a fair chance at life by society.

Appellant's whole character was on trial at that point, see, *Commonwealth v. Beasley,* 505 Pa. 279, 479 A.2d 460 (1984), and the jury could have decided to exercise "mercy"

as discussed in *Caldwell, supra.* They had the statutory list of mitigating factors with them during their deliberations, and it would seem to us to have been unusual, as a practical matter, if they had not considered the nature and source of the sole testimony against Appellant. On this basis then, we do not find the Assistant District Attorney's statements to have been harmless under these circumstances, and hence, we reject the Commonwealth's second argument as well. Because of the prejudicial statements made to the jury herein, the death sentence against Appellant must be reversed.[11] In view of our conclusion that the death sentence must be set aside, it is unnecessary for us to consider the additional issues raised by Appellant regarding ineffective assistance of counsel in the sentencing phase.

The convictions are affirmed, the sentence of death is set aside and the case is remanded to the trial court for the imposition of a sentence of life imprisonment without parole.

---

11. We also take strong exception to the Assistant District Attorney's remarks disparaging the role and function of this Court. This Court (along with Federal Courts) has always sought to guard and protect jealously the rights that all citizens enjoy under the law and under both the United States Constitution and that of the Commonwealth of Pennsylvania. To suggest that a defendant be given a death sentence because we will somehow be derelict in following the law or the Constitution is utterly outrageous.