555 A.2d 846

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Mumia ABU–JAMAL, a/k/a Wesley Cook, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 19, 1988.

Decided March 6, 1989.

Marilyn J. Gelb, Philadelphia, for appellant.

Karl Baker, Philadelphia, for Amicus–Nat. Conf. of Blk. Lawyers.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Philadelphia, Marianne E. Cox, Asst. Dist. Atty., Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION

ZAPPALA, Justice.

We review the judgment of sentence of death imposed on Mumia Abu–Jamal, found guilty of first degree murder in the December 1981 shooting death of Philadelphia police officer Daniel Faulkner.

The evidence presented at trial established that at approximately 3:55 a.m. on December 9, 1981, Officer Faulkner made a routine car stop on Locust Street between Twelfth and Thirteenth Streets in Center City Philadelphia. The car was driven by the appellant's brother, William Cook. After making the stop, Officer Faulkner called for assistance on his police radio, requesting a police wagon to transport a prisoner. While Faulkner was trying to handcuff Cook, the appellant ran from across the street and shot the officer

once in the back. Faulkner was able to fire one shot, which wounded the appellant, but after Faulkner had fallen to the ground the appellant shot him four more times at close range, once through the center of the face. The appellant was found slumped against the curb in front of Cook's car and taken into custody by police officers who arrived on the scene within thirty to forty-five seconds. The officers had been in the area and were turning onto Locust Street from Twelfth Street in response to Faulkner's radio request. They were flagged down by a cab driver who had witnessed the shooting while stopped at the intersection of Thirteenth and Locust. Two other pedestrians also witnessed the incident and identified the appellant as the perpetrator, both at the scene and during the trial.

On the foregoing summary we have no doubt as to the sufficiency of the evidence to support the verdict of first degree murder, a point the appellant does not contest. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982).

## I.

The appellant first argues that he is entitled to a new trial on account of several errors occurring during jury selection. Principal among these arguments is the contention that the prosecution systematically excluded jurors by race through the use of peremptory challenges, violating rights of equal protection and trial by impartial jury secured by the Fourteenth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution. The appellant relies on *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), as setting the standard for reviewing claims of improper use of peremptories, and cites to portions of the record that, he argues, meet that standard. The appellant notes that he is black and the victim was white. He states that the prosecutor used eleven peremptory challenges to remove blacks from the jury, with the result that the original panel consisted of ten whites and two blacks. Furthermore, one of

the black jurors was replaced before the start of the trial by an alternate, who was white, resulting in a greater racial imbalance. The appellant argues that he has proffered sufficient evidence to raise an inference that the prosecutor used his peremptory challenges because of race. Accordingly, the case should be remanded for an evidentiary hearing to determine whether the Commonwealth can overcome the presumption of discriminatory use of challenges.

In *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), in ruling on the question of the retroactive application of *Batson*, the U.S. Supreme Court held broadly that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." The Commonwealth properly observes, however, that even where retroactive application is required, it is only appropriate where the issue has been preserved. *Commonwealth v. Hernandez*, 498 Pa. 405, 446 A.2d 1268 (1982); *see also, Shea v. Louisiana*, 470 U.S. 51, 58, n. 4, 105 S.Ct. 1065, 1070, n. 4, 84 L.Ed.2d 38 (1985) (*Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) retroactively applicable to cases on direct review, "subject, of course, to established principles of waiver, harmless error, and the like.") The Commonwealth then argues that the appellant made no claim, either during *voir dire* or post-trial, that the prosecutor used his peremptory challenges for an impermissible purpose. In further demonstration that any challenge to the racial composition of the jury was waived, the Commonwealth notes that the appellant made only an incomplete record of the relevant information, and here attempts to rely on defense counsel's affidavit, filed four years after the fact and obviously *dehors* the record, to establish his claim.

■ There can be no doubt that under the longstanding teaching of *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974), the appellant has waived any claim that the prosecutor engaged in discriminatory use of peremptory

challenges to obtain an unrepresentative jury. Not only did he fail to advance the issue in any form resembling that adopted by the Supreme Court in *Batson,* he made no attempt even to frame the issue under the then prevailing rules of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

We have, at times, indicated that because of the extreme, indeed irreversible, nature of the death penalty, it may be appropriate to relax application of the waiver rule and address the merits of arguments raised for the first time in the direct appeal to this Court. *Commonwealth v. Zettlemoyer; Commonwealth v. Holcomb,* 508 Pa. 425, 434, n. 6, 498 A.2d 833, 837, n. 6 (1985) (Plurality). In other capital cases, however, we have held that certain issues were waived for failure to raise them before the trial court. *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373 (1986); *Commonwealth v. Szuchon,* 506 Pa. 228, 484 A.2d 1365 (1984). In light of this, the Commonwealth has argued in the alternative—waived or not, the appellant's claim of improper use of peremptories is without merit. In this regard, the Commonwealth disputes the representations made by the appellant as to the race of several prospective jurors, peremptorily excused, whose race does not appear of record. The Commonwealth also argues that the mere invocation of a disparity in the numbers of blacks and whites who sat on the jury is inadequate and unreliable as an indicator of whether a prima facie case has been made out. It is noted that in at least one instance the appellant used a peremptory challenge to strike a black venireperson deemed acceptable by the Commonwealth, and the record clearly indicates that the Commonwealth had no responsibility for the circumstances that required replacement of a black juror with a white alternate juror. Finally, the Commonwealth presents non-racial reasons, apparent on the face of the record, to justify the use of a peremptory challenge against each of the prospective jurors isolated by the appellant.

In *Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101 (1988), a pre-*Batson* case where the appellant *had* preserved a claim that the prosecutor impermissibly discriminated by race in the use of peremptories, we determined that to give the appellant the protections provided by *Batson*, it was sufficient for this Court to engage in a *post hoc* review of the record.

Applying the "standards" set out in *Batson*, 476 U.S. at 95–98, 106 S.Ct. at 1722–3 for assessing whether a prima facie case exists, vacuous though they may be, we do not hesitate to conclude that no such case is made out here. That the appellant is a member of a cognizable racial group and that the prosecutor used peremptory challenges to remove some members of the appellant's race are facts so obvious to anyone even marginally acquainted with this case as to cause embarrassment at the need to set them out in writing. They are, nevertheless, two of the three "elements" necessary to establish a prima facie case. According to *Batson*, these facts, when taken with "any other relevant circumstances", must raise an inference that the prosecutor used his peremptory challenges to exclude venirepersons on account of their race. Examples of such "relevant circumstances" that might support or refute such an inference are a "pattern" (or not) of strikes against black jurors, and the prosecutor's questions and comments during *voir dire*.

 We agree with the Commonwealth that mere disparity of number in the racial make-up of the jury, though relevant, is inadequate to establish a prima facie case. The ultimate composition of the jury is affected not only by the prosecutor's use of peremptories, but by the defendant's use of such, by challenges for cause (more acute in capital cases because of the *Witherspoon* inquiry), and by jurors' inability to serve for personal reasons. The Commonwealth cites at least one instance where the appellant removed a black juror already passed as acceptable by the Commonwealth; it cannot be determined whether any of the venire, who were dismissed when it was the appellant's turn to

first pass on their acceptability, were black and might have been acceptable to the Commonwealth. Moreover, we find no "pattern" in the use of peremptories. The Commonwealth used fifteen of the twenty available challenges. The record reflects that eight of these venirepersons were black. Had the appellant not peremptorily challenged the black venireperson acceptable to the Commonwealth, the first two jurors seated would have been black. We also note our agreement with the Commonwealth's argument that the replacement of the first juror chosen, a black woman, with an alternate, a white man, was entirely beyond the Commonwealth's control, and the resulting disparity in numbers of blacks and whites on the jury is no basis for an inference of purposeful discrimination. Finally, we have examined the prosecutor's questions and comments during *voir dire*, along with those of the appellant and his counsel, and find not a trace of support for an inference that the use of peremptories was racially motivated.

The appellant also argues that the court erred in denying his challenge for cause as to the first alternate juror chosen from the venire, Edward Courchain. According to the appellant, Courchain's responses when questioned, first by the prosecutor and then by defense counsel, demonstrated his inability to be fair, to dismiss preconceived notions about the case, and to follow the instructions of the court.

The transcript indicates that Courchain was questioned at great length about these matters and at times gave answers that warranted doubts about his ability to serve. The Commonwealth argues that the transcript demonstrates that Courchain had misunderstood the questions put to him, and that when they were properly rephrased he evidenced the ability to be impartial and follow the court's instructions based on the evidence produced in court. The trial judge, who was present to hear Courchain's responses and observe his demeanor, agreed with the Commonwealth.

A trial court's decision to deny a challenge for cause is reversible only for palpable abuse of discretion. *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811 (1985). Here,

the court applied the proper standard for determining the juror's ability to serve, and there was more than sufficient record testimony to support the conclusion that the standard was met.

The appellant argues in the alternative that if the challenge for cause was properly denied, he ought to have been allowed to exercise a peremptory challenge to remove Courchain. Of necessity, he gilds this argument with a claim that trial counsel was ineffective, because the denial of a peremptory challenge was not asserted as error in post-trial motions.

■ The appellant argues that he had only used nineteen peremptory challenges before Courchain was examined, and that the court therefore erred in ruling that he had none remaining to use against Courchain. The Commonwealth rebuts this argument by noting that Courchain was examined after the original panel of twelve jurors had been seated. The appellant had exercised eighteen of his allotted twenty peremptory challenges during the selection of the panel of twelve, and had used another to remove a venireperson prior to Courchain being questioned as a potential alternate. Pennsylvania Rule of Criminal Procedure 1108(b) explicitly negates the appellant's inference that peremptory challenges not used in selecting the jury may be "carried over" for use in the selection of alternates. ("All peremptory challenges remaining unexercised after the selection of the principal twelve jurors shall be considered exhausted....") The rule clearly separates the peremptories for use in the selection of alternates from those available for selection of the principal jury, and so the appellant's argument in this regard must fail.[1]

1. There is apparent from this scenario a question of interpretation as to Rule 1108(b) that has not been raised by the parties, or more precisely, the answer to which has been assumed by all the parties. The Rule provides that "the defendant and the Commonwealth shall each be entitled to one peremptory challenge for each two alternates to be selected." Quaere whether, if four alternates are to be selected, each side has two peremptories available for use at any time during the alternate selection process? Or whether each side has one peremptory for use in selecting the first two alternates and one for use in

The third error in the voir dire proceedings that the appellant identifies is the trial court's decision to assume, for a time, the questioning of prospective jurors. The appellant had been granted permission to represent himself, and back-up counsel had been appointed. After the first two days of *voir dire*, however, the trial court determined that the appellant's questioning was unnecessarily lengthy and often improper. The judge also observed that many of the venirepersons were "visibly shaken and uncomfortable". Concerned that a fair and impartial jury might not be possible to achieve by such laborious and disquieting procedures, the court took upon itself the task of posing all questions to the prospective jurors. This procedure was used for only half a day, however, because the appellant consented to allow back-up counsel to conduct *voir dire* questioning thereafter.

■ The appellant argues very broadly that the court's decision to undertake the *voir dire* questioning violated his Sixth Amendment right to self-representation, his Fourteenth Amendment due process rights, and the similar rights guaranteed by Article I, Section 9 of the Pennsylvania Constitution. He claims that the court's decision was based merely on expediency, which, he asserts, ought not outweigh his constitutional right to represent himself.

The right of self-representation is not, as the appellant would have it, an absolute right for a defendant to proceed as he sees fit. A defendant appearing *pro se* is subject to the same rules of procedure as is a counseled defendant; he has no greater right to be heard than he would have if he were represented by an attorney.

selecting the second pair, the first one being "waived" if not used before the first two alternates are seated? In the present case, the unstated holding of the trial court must have been in conformity with the latter view. Four alternates were to be selected, and the appellant had only used one peremptory challenge before Courchain was examined. He was later permitted to use a peremptory challenge prior to the seating of the third alternate juror. Under the first interpretation of Rule 1108, the peremptory challenge of Courchain would have been allowed, the appellant thereafter having no peremptory challenges remaining for use in the alternate selection process.

██ Rule of Criminal Procedure 1106(d) provides that "[t]he judge *may permit* the defense and the prosecution to conduct the examination of prospective jurors *or may itself [sic] conduct the examination.*" (Emphasis added.) It is apparent that the manner in which *voir dire* will be conducted is left to the discretion of the trial judge; discretionary rulings will be reversed only where the record indicates an abuse of the discretion given. The appellant argues only in the most general of terms that once he had been permitted to conduct the questioning himself, it was error for the court to change the procedure. The court, however, amply documented its reasons for acting as it did, and we find no error in that decision. There being no requirement, constitutional or otherwise, that the parties, through counsel or *pro se,* be permitted to engage in *voir dire* questioning, the court's decision cannot be said to have deprived the appellant of any aspect of his rights of self-representation and due process.

The appellant also claims he was deprived of meaningful ability to present a defense, in violation of his due process rights, by failure of the court to afford adequate investigative resources. According to the appellant, the court's allowance for investigators was insufficient to enable him to contact two witnesses.

We will not dwell on this argument beyond noting that our review of the record confirms the Commonwealth's assertions that the allowance for investigative resources was more than what is represented in the appellant's brief; that there is no indication that other requests were made, or would have been denied had they been made; that the witnesses alluded to were not unavailable to the appellant for lack of funds but merely because the appellant chose not to pursue their testimony until it was too late; and that there is no indication that these witnesses would have offered testimony helpful to the appellant.

## II.

The appellant identifies two flaws in the proceedings to determine his guilt that he argues require reversal of the

judgment and grant of a new trial. The first of these concerns the Commonwealth's cross-examination of a character witness, offered by the appellant to establish his reputation as a peaceful law-abiding citizen. The appellant argues that the cross-examination should not have been permitted at all because it was irrelevant to the witness's familiarity with the appellant's reputation; alternatively, he argues that its limited relevance was far outweighed by its prejudicial nature. He also argues that the prosecutor's questioning raised inflammatory matters without foundation, seeding innuendo in the minds of the jury.

The witness in question was Sonia Sanchez, a writer and professor at Temple University. On direct examination, she testified that she had known the appellant for about three or four years, becoming acquainted with him through his writings and commentaries, and, more directly, through conversations at events where they both appeared. She further testified that the appellant was "viewed by the black community as a creative, articulate, peaceful, genial man."

The prosecutor's cross-examination of Sanchez then proceeded as follows:

Q: Miss Sanchez, in reference to your writing you wrote a Forward, did you not, for the book 'Asata Speaks,' correct?

A: That is correct.

Q: Did that not deal with convicted police killer Judy Chesmar's [sic] case?

A: Did you read it?

Q: I am asking you?

A: It has nothing to do with that at all. It has to do with her as a black woman in America.

Q: Were you not in sympothy [sic] with her position and through the surrounding circumstances of her action?

A: That is not correct. That is why I asked you did you read it?

Q: Is it a fact, Miss Sanchez,—if you would answer my question—

A: (Interposing) I am trying to.

Q: `It does deal with Miss Judy Chesmar [sic], is that correct?

A: It deals with her as a black woman.

Q: And was she not convicted of killing a policeman and is presently a fugitive [sic] from justice, is that correct?

A I think so.

N.T. 6/30/82, 18–19.

After a sidebar discussion, the court overruled the appellant's objection to this line of questioning, and the prosecutor continued:

Q: Also, Miss Sanchez, did you have occasion to publicly speak in support of Herman Bell, Anthony Bottom and another Defendant by the name of Washington who were convicted killers of three police officers in New York?

A: No, I didn't.

N.T. 6/30/82, 23.

Again the appellant's objection was overruled and the cross-examination concluded with the following exchange:

Q: ... Did you in anyway [sic] publically [sic] either support, discuss, write or in any sense indicate awareness and direct concern about those Defendants Anthony Bottoms, Herman Bell, and also a Defendant by the name of Washington?

A: Who are they? Would you explain who they are? Evidently you know who they are.

Q: The answer then is you did not know and had nothing to do with them?

A: I am asking you who they are?

Q: They were three Defendants convicted of killing three police officers.

Any connection with them at all in your memory?

A: No.

N.T. 6/30/82, 26–27.

The trial court ruled that these questions were permissible inquiries into the witness's bias or possible motive for offering testimony. We find no error in this ruling. The theory the Commonwealth sought to explore was that the witness had, in other circumstances, spoken or written favorably about people who had been convicted of killing policemen. Such a fact, if established, would obviously not be relevant to show that the appellant had killed a policeman. It could, however, indicate to the jury that Sanchez had an enmity toward policemen, an attitude that could cause her to shade her testimony to benefit the appellant. As the Commonwealth suggests, this fact is also relevant to defining the community Sanchez referred to as regarding the appellant as a peaceful man. If the "community" viewed policemen as "oppressors" and gave favorable acknowledgment to convicted police killers, this would be relevant to the jury's assessment of Sanchez's testimony about the appellant's reputation.

In *United States v. Abel*, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984), in deciding whether the Federal Rules of Evidence allowed impeachment of a witness for bias, the United States Supreme Court summarized the common law of evidence on this point.

Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' [sic] like, dislike, or fear of a party, or by the witness' [sic] self-interest. *Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' [sic] testimony.* The "common law of evidence" allowed the showing of bias by extrinsic evidence, while requiring the

cross-examiner to "take the answer of the witness" with respect to less favored forms of impeachment.

469 U.S. at 53, 105 S.Ct. at 469 (Emphasis added.)

■ The appellant asserts that the prosecutor's examination of Sanchez should have been limited to questions testing the accuracy of her testimony about his reputation and her familiarity with it. In essence, he argues that character witnesses should be exempt from examination to show bias or motive. This is not an accurate statement of the law. See *Commonwealth v. Butts,* 204 Pa.Super. 302, 204 A.2d 481 (1964); *Commonwealth v. Hess,* 170 Pa.Super. 145, 84 A.2d 246 (1951); *Commonwealth v. Robzin,* 78 Pa.Super. 290 (1922).

■ The appellant also argues that the prosecutor's questions were inflammatory and without foundation, asked only to cast innuendo and create an impression of guilt by associating the appellant, however indirectly, with other police killings. We have no basis for disturbing the trial court's ruling on this account. Beginning with the proposition that a decision to admit or refuse evidence will not be disturbed unless there has been an abuse of discretion, we note that the appellant made no request for an offer of proof when the prosecutor, at side bar, offered his theory for pursuing this line of questioning. There is thus no reason in the record to credit his assertion here that the questions were without foundation, or more accurately, to discredit the Commonwealth's assertion to the trial judge that it had information suggesting that Sanchez had indeed made the comments she was being questioned about. As for the claim that the potential for prejudice outweighed the limited relevance of the evidence, this too is a discretionary ruling subject to limited review. We find nothing to warrant reversal of the trial court's assessment of the relative weights of prejudice and relevance under the circumstances.

■ The appellant's final claim of error as to the first phase of his trial is that the prosecutor's closing argument contained an improper attempt to persuade the jurors to

resolve any doubts they might have in favor of conviction by shifting ultimate responsibility for the outcome of the trial from the jury to the appellate courts. The language complained of is contained in the following excerpt from the transcript.

> [Y]ou as a unit are in a position of deliberating and reaching a decision and *a decision of finality to a certain degree.* If your decision of course were to acquit, to allow the Defendant to walk out, that is fine. There is nothing I can do and there is nothing that the judge or anyone could do that would affect that in any way.
>
> *If you would find the defendant guilty of course there would be appeal after appeal and perhaps there could be a reversal of the case, or whatever, so that may not be final.* Nonetheless the action which you have is immense, extremely important.

N.T. 7/1/1982, 145–46. The appellant cites *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and *Commonwealth v. Baker*, 511 Pa. 1, 511 A.2d 777 (1986) in support of his claim that the highlighted comments deprived him of a fair trial by offering the jury the opportunity to refrain from deliberating at all, deferring instead to the power of the reviewing court.

█ It must be acknowledged that were this not a capital case, this claim of error would be summarily dismissed as having been waived. No objection was made at the time of trial, the issue was not addressed in post-verdict motions, and appellate counsel has not claimed that trial counsel's ineffective assistance in this regard is a special circumstance justifying appellate review despite the waiver. Nevertheless, we will address it on the merits in light of "relaxation" of the waiver rule previously noted as being appropriate in capital cases.

In *Baker*, we found no reversible *trial* error in comments very similar to these. The rule is that a new trial is not required unless the unavoidable effect of the prosecutor's language would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that

they could not weigh the evidence and render a true verdict. *Commonwealth v. Burton*, 491 Pa. 13, 417 A.2d 611 (1980); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975). In the context of the entire summation, it is clear that the prosecutor was not attempting to suggest that the jury should resolve any doubts by erring on the side of conviction because an error on the side of acquittal would be irreversible. In fact, the prosecutor prefaced the previously quoted argument in this manner:

There is no question with respect to what Mr. Jackson [defense counsel] said with regard to the system and the importance of the jury. I should like to add directly to this. The power of the jury is immense. Truely [sic] immense. Because your actions will determine actions.

N.T. 7/1/82, 145. In light of the court's repeated instructions to the jury that the arguments of counsel were neither evidence nor statements of the law to be followed, and the instructions on the Commonwealth's burden of proving all elements of the crime charged beyond a reasonable doubt, we are not persuaded that the isolated comments now complained of deprived the appellant of a fair trial. We note, however, that a similar argument directed against the prosecutor's comments at the penalty phase of the trial is subject to a different standard of review and requires separate analysis, which we now undertake.

## III.

In *Caldwell v. Mississippi*, the United States Supreme Court held that a death sentence had to be set aside where the prosecutor had suggested to the jurors that they did not bear ultimate responsibility for determining the appropriateness of a death sentence since such a sentence would be reviewed by the state supreme court. The Court's holding was based on the Eighth Amendment's heightened need for reliability in the determination that death is the appropriate punishment in a particular case.

We applied the reasoning of *Caldwell* in *Commonwealth v. Baker*, vacating the death sentence because the prosecu-

tor's argument to the jury contained several references that we found created a "significant possibility ... that reluctant jurors were persuaded to give in because of the argument that the Supreme Court of this Commonwealth would review the matter." 511 Pa. at 24–25, 511 A.2d at 789–790. The appellant observes that his case was tried by the same prosecutor at about the same time as *Baker* was tried, and that the prosecutor employed nearly identical language in both cases. He argues that a like result is required here. However, because what is said in one context can take on different meanings in another, we must examine what the prosecutor said, in the circumstances of *this* case, to determine if it created a risk that *this* jury's deliberations and decision in favor of the death penalty were tainted by impermissible considerations.

■ The comments that the appellant complains of as improper under the rule of *Caldwell* are as follows:

Ladies and gentlemen, you are not asked to kill anybody. You are asked to follow the law. The same law that I keep throwing at you, saying those words, law and order. I should point out to you it's the same law that has for six months provided safeguards for this defendant. The same law, ladies and gentlemen, the same law that will provide him appeal after appeal after appeal....

The same law that has made it so because of the constant appeals, that as Mr. Jackson said, nobody at all has died in Pennsylvania since 1962 for an incident that occurred in 1959. Who, by the way, and it's only by the way, in fact he also was a white man, Elmo Smith was the name; remember that going way back, 1959 incident? The rape and murder of Mary Ann Mitchell. The last one who was executed and that's over 20 years; appeal after appeal after appeal. That law should be that way and that law should be followed, and he should have every appeal. But the same law that permits this, ladies and gentlemen, let us—let me urge you to consider and enforce that law today because the law is not—or, the law is, rather, a double edged saw, it works for both sides. It works for both sides.

So when you are determining in reference to the evidence only, and that evidence would be aggravating and mitigating circumstances, nothing more. In considering those, only consider the evidence you heard....

N.T. 7/3/82, 71–73.

In *Baker*, we characterized the objectionable comments as attempts to minimize the jury's sense of responsibility for a verdict of death and to minimize their expectations that such a verdict would ever be carried out. Those comments appeared in context as follows:

Let me give you an example when I say capital punishment and the rights of the individual. The last person that was executed in this state was Elmo Smith and his crime was in 1959; Mary Anne Mitchell in 1959, in Manyunk. Remember it? Well, it was in the newspapers. He was the last person that was executed in 1963. *You get an appeal after appeal after appeal, if you think the Supreme Court is going to let anybody get executed until they're absolutely sure that man has a fair trial make no mistake about that.* I'm not going to go any further.

I just want you to understand that once you leave, this man is not going to have the switch pulled in a matter of hours. That just doesn't happen. It goes on and on and on. I'm not going to sit here and tell you what the system is all about.

511 Pa. at 20–21, 511 A.2d at 787 (emphasis added in the Opinion of the Court.) At the end of his summation, the prosecutor returned to this theme using the following language:

... but just understand this, no matter what your decision is, ladies and gentlemen, it will be and I can assure you as much as I am standing here now, there will be considerable time and considerable appeals to be before any kind of finality occurs in this particular action.

*Id.*

Having carefully examined the record of the sentencing hearing in its entirety, we conclude that the prosecutor's

remarks in this case did not create a risk that the jury would abdicate the "awesome responsibility" of deciding the appropriateness of the sentence of death, notwithstanding the commonality of many words and phrases between this case and *Baker*. We note particularly these significant differences:

1) Absent from the Assistant District Attorney's remarks about the appeal process was the reference that this Court would not let anyone be executed until absolutely certain that a fair trial had been had. The reference was, instead, a generic one, placing the appeals process in the broad context of "the law" that governed the entire case. 2) In *Baker*, we found nothing in defense counsels' argument that invited the type of argument made by the prosecutor. We find that the argument here was within the bounds of proper response and did no more than suggest that the jury's decision, like the appeals and all other procedures, was part of the system of "law and order" that ought to govern the case. In *Baker*, it was the prosecutor who first noted that no one had been executed since 1963 and without further explanation added his comments about the length and thoroughness of the appeals process. The juxtaposition of these observations in this manner created an unacceptable possibility that the jurors could conclude that even if they voted for a death sentence it would likely never be carried out. In this case the prosecutor's argument was more limited. He did not initiate the reference to the last time an execution had been carried out. Rather this was offered as an aside, following up on defense counsel's prior reference to it. Defense counsel had used the *Smith* reference to argue that because no-one had been executed in Pennsylvania since the United States Supreme Court's decisions in 1976 approving some death penalty procedures, there was some doubt as to whether the death penalty could be constitutionally imposed and carried out in Pennsylvania. This argument followed immediately upon the suggestion that all executions carried out prior to the 1972 decisions striking down capital sentencing

schemes had been unconstitutional and that "thousands of people" had thus "been killed in America unconstitutionally." Defense counsel bluntly argued to the jurors that if they imposed a death sentence that ultimately was carried out, and at a later time the United States Supreme Court again declared capital punishment unconstitutional, their sentence would have been illegal and thus they would have participated in the "murder" of the appellant.

3) In *Baker*, the jury had reported itself hopelessly deadlocked on the proper sentence, and had later indicated substantial confusion about the role of aggravating and mitigating circumstances in reaching a decision as to life imprisonment. In such a circumstance the potential was particularly great that a wavering juror might assent to a verdict, not because he believed it to be proper but because he believed this Court would re-examine it for appropriateness. The effect of the risk inherent in the prosecutor's argument was thus magnified. In this case we find no comparable circumstances.

The appellant makes an additional claim that error at the sentencing portion of his trial requires that the sentence of death be vacated. He complains that the prosecutor should not have been permitted to cross-examine him about either his membership in the Black Panther Party or about statements attributed to him in a newspaper article about the Black Panthers. First, the appellant argues that he should not have been subjected to cross-examination at all. In the alternative, he argues that the questions asked were irrelevant to the only proper inquiries at the sentencing hearing, aggravating and mitigating circumstances, that they were inflammatory, and that they infringed his constitutionally guaranteed rights of speech and association.

The appellant's claim that cross-examination of him at the penalty hearing should have been entirely prohibited rests on the premise that when he spoke to the jury he was exercising his right to allocution, which, as traditionally understood, does not admit of cross-examination. This premise is derived from cases detailing the development of

the allocution right at common law, especially as an element of capital cases, see, e.g., *Commonwealth v. Gates,* 429 Pa. 453, 240 A.2d 815 (1968); *Commonwealth ex rel. Ashmon v. Banmiller,* 391 Pa. 141, 137 A.2d 236 (1958), and from cases insisting that the right, as implemented by Pa.R. Crim.P. 1405(a), must not be denied or impaired, e.g., *Commonwealth v. Curry,* 318 Pa.Super. 490, 465 A.2d 660 (1983). The appellant notes that he did not submit to questioning by his counsel, but instead directly addressed the sentencing body, the jury, reading from a statement that he had prepared.

We reject the suggestion that cross-examination of a defendant at the penalty hearing of a capital case is improper. The first flaw in the appellant's argument is that the reference to Pa.R.Crim.P. 1405(a) is clearly misplaced. The Rules of Criminal Procedure contain a separate section, Subchapter 350, providing special rules for cases in which the death sentence is authorized. Rules 352(b) and 353(b) state that "the sentencing proceeding shall be conducted *as provided by law.*" (Emphasis added.) The Comments to these Rules confirm that the law referred to is the statute adopted by the General Assembly, 42 Pa.C.S. § 9711.

This points up the second flaw in the appellant's reasoning, reliance on the right to allocution as developed at common law. Whatever force the common law of allocution has with respect to other criminal cases, the General Assembly has abrogated that law and replaced it with statutory law devised specifically for first degree murder cases. The legislature has provided that a sentencing hearing is required at which evidence may be presented to the jury, or the judge as the case may be. The court is given discretion to determine what evidence will be received as relevant and admissible on the question of the sentence to be imposed. Following the presentation of evidence, counsel are permitted to argue to the sentencing body for or against the death sentence.

It is apparent from the structure provided that this evidentiary hearing is intended to serve as part of the "truth-

determining process" to enable the sentencer to discern and apply the facts bearing on the determination of the appropriate sentence. Implicit in the fact that the statute assigns to the defendant the burden of proving mitigating circumstances by a preponderance of evidence is the understanding that the jury is to asses the evidence for credibility. It must be left open for the Commonwealth to challenge the veracity of facts asserted and the credibility of the person asserting those facts, whether that person is a witness or the defendant. We find no reason in law or logic why the defendant's presentation of evidence in support of his claim that life imprisonment is the appropriate sentence should be shielded from the testing for truthfulness and reliability that is accomplished by cross-examination.

 Having rejected the appellant's argument that his plea in mitigation should have been exempt from cross-examination, we turn to his alternative arguments that the examination as conducted was improper. The first of these arguments is that the prosecutor's inquiry was unrelated to any aggravating circumstance and that the statutorily defined aggravating circumstances are the only matters relevant for the prosecutor to pursue. We do not read the statute as limiting the scope of the sentencing hearing to this extent. The legislature has directed that "[i]n the sentencing hearing, evidence may be presented *as to any matter that the court deems relevant* and admissible on the question of the sentence to be imposed *and shall include matters relating to any of the aggravating or mitigating circumstances* specified in subsections (d) and (e)." 42 Pa.C.S. § 9711(a)(2) (emphasis added). If matters relating to the aggravating and mitigating circumstances were the only matters capable of being explored, the first phrase emphasized above would be surplusage, indeed, misleading surplusage. Such a reading would, of course, be contrary to the most basic rules of statutory construction.

There are, to be sure, limitations, inherent in the Eighth Amendment to the federal Constitution on admitting information that creates an impermissible risk that the capital

sentencing decision will be made arbitrarily. See, e.g., *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (victim impact statement). It has never been held, however, "that the defendant's record, characteristics, and the circumstances of the crime are the *only* permissible sentencing considerations." *Id.*, at 502, 107 S.Ct. at 2532 (emphasis in original).

The suggestion that the appellant's interpretation is required by *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985), fails on two counts. First, Holcomb was a plurality Opinion Announcing the Judgment of the Court, and thus not of precedential weight. More importantly, the Opinion did not suggest that a prosecutor's evidence and argument are limited to the enumerated aggravating circumstances. What is limited are the factors on which a sentence of death can be based. Thus, for example, a prosecutor could not introduce evidence and argue to the jury that a defendant convicted of first degree murder merited the death penalty *because of* a psychiatric report that he could kill again. If, however, the defendant offered evidence that he was not likely to be dangerous in the future, the prosecutor would not be prohibited from introducing such contrary evidence in its possession for the purpose of contradicting the defendant's assertions.

■ Next, the appellant argues that the limited relevance of the evidence elicited by the cross-examination was outweighed by the inflammatory and prejudicial nature of that evidence. The questions complained of referred to a 1972 newspaper article in which the appellant had been identified as a member of the Black Panther Party. Among other things, the article quoted the appellant as having said that, "political power grows out of the barrel of a gun." A related argument is also advanced, and supplemented by amici curiae, that by questioning the appellant in this manner; the prosecutor was infringing on the appellant's First Amendment rights of free speech and association, improperly linking him to an unpopular political organization and its perceived violent philosophy.

Much of this latter argument is developed from United States Supreme Court cases overturning convictions based on statutes criminalizing either the mere expression of views or membership in, or association with, a group advocating or employing illegal conduct such as violence without proof of the individual defendant's participation in any illegal act. *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Noto v. United States*, 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961); *Scales v. United States*, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). Punishing a person for expressing his views or for associating with certain people is substantially different from allowing his statements to be used for impeachment or to be considered as evidence of his character where that character is a relevant inquiry.

Amici curiae badly misrepresent this case in suggesting that it is of the type that the Court in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), suggested would necessitate vacating of a death sentence because of the invalidity of an aggravating circumstance. Stephens had argued that because the trial court had instructed the jury on an aggravating circumstance later found to be invalid, the jury's deliberations may have been tainted by irrelevant considerations. The Court's response suggested only that it would violate due process for a state to make constitutionally protected conduct an aggravating circumstance, thereby "elevating" a crime to the status of a capital offense on the basis of impermissible factors. The appellant and amici conveniently ignore that portion of the Opinion in *Stephens* immediately following the paragraph they cite. The Court, observing that the statutory aggravating circumstance had been invalidated for vagueness, nevertheless found no harm in the jury having been instructed about it because the underlying evidence was fully admissible in the sentencing phase. Indeed, the Court quoted from *Gregg v. Georgia*, 428 U.S. 153, 203–204, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976) (plurality), the following:

We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument.... So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information as possible when it makes the sentencing decision.

462 U.S. at 886–887, 103 S.Ct. at 2748.

Simply put, the jury was not instructed or led to believe that the appellant's statements or his Black Panther Party membership, in and of themselves, should or could be considered as aggravating factors, on a par with the circumstances enumerated in § 9711(d), weighing in favor of the death penalty. The prosecutor simply introduced evidence by way of cross-examination, and clearly limited his use of this evidence to: 1) rebutting the suggestion advanced at trial by way of character witnesses that the appellant was a "peaceful, genial" man, 2) countering the appellant's claim at the penalty hearing that the incident in which Officer Faulkner was killed was in fact a failed attempt by the police to execute the appellant, and 3) in an oblique way, supplementing the "law and order theme" of his summation, by which he tied together, through use of contrast, the purpose of aggravating circumstance (d)(1), the jury's function in deciding on a penalty according to the law, and the appellant's longstanding disdain for the system.

The appellant also advances a number of arguments for vacating the death sentence which we have fully considered, but reject without extended discussion, either because we have clearly decided identical claims to the contrary in previous cases, or because they are fact-bound and patently without merit. In either case, no jurisprudential value would be served by addressing them in detail. These claims are, (1) that the death penalty statute is unconstitutional because it mandates the sentence of death without requiring the sentencer to consider the appropriateness of the penalty (rejected in *Commonwealth v. Cross*, 508 Pa. 322,

335–336, 496 A.2d 1144, 1151–52 (1985)); (2) that a juror was improperly excluded for cause under the standards of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); and *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (transcript demonstrates juror's unequivocal opposition to death penalty, inability to impose it even under instructions from court); (3) that by incorporating the trial record into the sentencing proceeding, the inflammatory cross-examination of defense witness Sanchez was placed before the jury, introducing an unacceptable degree of unreliability (cross-examination was proper [see text, infra, at 14–16], comment was limited); and, (4) that the Commonwealth presented and argued non-statutory aggravating factors by pointing out that the victim was a year younger than the defendant and that the defendant's brother, who was close to the shooting, might have been placed in great risk of harm (former was proper argument against mitigating circumstance (e)(4), latter was proper argument for aggravating circumstance (d)(7), was not vigorously pursued, and was not found by the jury).

██ Finally, we have conducted the proportionality review required by 42 Pa.C.S. § 9711(h)(3)(iii) and find no basis to conclude that the penalty imposed here is disproportionate, either to the offense, or to the penalty imposed in similar cases.

The judgments [2] of sentence are affirmed. The prothonotary of the Eastern District is directed to transmit a full and complete record of the trial, sentencing hearing, imposition of sentence, and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).

LARSEN, J., did not participate in the consideration or decision of this case.

NIX, C.J., did not participate in the decision of this case.

---

**2.** The appellant has not challenged the sentence of two and one-half to five years' imprisonment imposed on the conviction of possession of an instrument of crime.