**Commonwealth v. Williams**

C.P. of Bucks County, No. 499-2010.

*Laura Seigle,* for Commonwealth.
*William Craig Penglase,* for defendant.

FINLEY, *J.,* July 6, 2011—Alan Craig Williams (appellant), appeals from the order of sentence imposed by this court on March 2, 2011. We file this opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## I. PROCEDURAL AND FACTUAL HISTORY

Following a jury trial, held on July 7, 8, 9 and 12, 2010, appellant was found guilty of rape by forcible compulsion,[1] rape by threat of forcible compulsion,[2] criminal attempt -- involuntary deviate sexual intercourse by forcible

---

1. 18 Pa.C.S. §3121(a)(1).
2. 18 Pa.C.S. §3121(a)(2).

compulsion,[3] sexual assault,[4] indecent assault by threat of forcible compulsion,[5] terroristic threats with intent to terrorize another,[6] and false imprisonment.[7]

These charges stemmed from an incident that occurred in the early morning hours of July 22, 2009. N.T., 7/7/10, p. 84. The victim, referred to herein as T.H., met the appellant through mutual friends the day prior to the incident. N.T., 7/7/10, p. 107. When they first met, appellant introduced himself to T.H. as "Ali Bob." N.T., 7/7/10, p. 108. T.H. and appellant, along with two other friends, hung out for a few hours, got food, and ultimately exchanged phone numbers. N.T., 7/7/10, p. 108-10. The next evening, while at her aunt's home on Chapel Street in Trenton, New Jersey, T.H. made plans to see appellant again. N.T., 7/7/10, p. 112. Appellant arrived at Chapel Street driving a white Pontiac, asked T.H. to take a ride with him to pick up his friend, and T.H. agreed. N.T., 7/7/10, p. 114. During the ride, appellant informed T.H. that he was a member of the gang, the Bloods. N.T., 7/7/10, p. 117. T.H. and appellant eventually crossed the Morrisville Bridge, heading into Pennsylvania, at which point T.H. asked appellant where they were going. N.T., 7/7/10, p. 116. Appellant assured her they would be there in 20 minutes. N.T., 7/7/10, p. 116.

The first stop they made that night was at the 7-Eleven on Trenton Avenue because appellant needed to get some food. N.T., 7/7/10, p. 117. While the appellant entered

3. 18 Pa.C.S. §901(a).
4. 18 Pa.C.S. §3124.1.
5. 18 Pa.C.S. §3126(a)(3).
6. 18 Pa.C.S. §2706(a)(1).
7. 18 Pa.C.S. §2903(a).

the store, T.H. remained in the car and called a friend. N.T., 7/7/10, p. 118. Unbeknownst to T.H., in addition to purchasing food, appellant also purchased a pack of condoms. N.T., 7/7/10, p. 198. After leaving 7-Eleven, appellant drove to the Country House Motel. N.T., 7/7/10, p. 127. Upon pulling into the hotel parking lot, T.H. asked appellant if his friend was staying at the motel. N.T., 7.7.10, p. 127. Without answering, the appellant walked into the motel's office. N.T., 7/7/10, p. 127. When appellant returned he approached the passenger side of the vehicle and told T.H. to get out. N.T., 7/7/10, p. 127. Not knowing where she was, T.H. refused to get out of the car. N.T., 7/7/10, p. 127. Appellant then walked to the back of the car, retrieved a gun, and pointed it at T.H.'s head. N.T., 7/7/10, p. 129. With the gun pointed at her head, T.H. exited the vehicle and followed appellant into a hotel room. N.T., 7/7/10, p. 130.

Appellant ordered T.H. to go in the bathroom, undress, and then lay down on the bed. N.T., 7/7/10, p. 131-32. T.H. complied. N.T., 7/7/10, p. 131-32. Appellant then pulled out a condom, put it on, and placed his penis in T.H.'s vagina. N.T., 7/7/10, p. 132. Appellant proceeded to rape T.H. as she struggled beneath him to get free. N.T., 7/7/10, p. 133. Appellant then took off the condom and attempted to place his penis in T.H.'s mouth, but stopped when she told him she would "bite it." N.T., 7/7/10, p. 135. After T.H. refused to perform oral sex, appellant ordered to her to get on her hands and knees and continued to rape her from behind.[8] N.T., 7/7/10, p. 136. T.H. told appellant she felt sick, and after the second time she said it, he let

_____
8. T.H. referred to this position as "doggie style." N.T., 7/7/10, p. 136.

her go to the bathroom. N.T., 7/7/10, p. 137. Throughout the encounter, appellant threatened that if T.H. reported anything to the police he would "get his homies to do something" to her. N.T., 7/7/10, p. 134.

Once in the bathroom, T.H. locked the door and threw on her top and bottoms, leaving her undergarments on the floor. N.T., 7/7/10, p. 138. T.H. then climbed on the toilet, resting one foot on the toilet paper holder, opened the bathroom window and forced herself through it. N.T., 7/7/10, p. 138-39. Once outside, T.H. got as far from the hotel as she could and eventually called the police. N.T., 7/7/10, p. 142-43. While waiting for the police to arrive, in the dark corners of the 7-Eleven parking lot, T.H. saw appellant drive by, back and forth on Trenton Avenue, several times.[9] N.T., 7/7/10, p. 143-44. T.H. was transported to the hospital by the police and a rape kit was performed. N.T., 7/7/10, p. 145.

Prior to the first listing for trial, during the middle of March, T.H. received a phone call from appellant's friend Andre, also known as Grip, and subsequently failed to appear in court.[10] N.T., 7/7/10, p. 147-48.

Pretrial motions were heard before the Honorable Rea B. Boylan on July 1, 2010. Following trial, on August 6, 2010, the district attorney's office filed a notice of mandatory minimum sentence which applied to the crimes of rape by forcible compulsion, rape by threat of

---

9. T.H. waited for the police at a 7-Eleven on Trenton Avenue. This 7-Eleven was not the same 7-Eleven they stopped at prior to going to the motel. N.T. 7/7/10, p. 143.

10. As a result, during a pre-trial hearing before the Honorable Rea B. Boylan on July 1, 2010, it was ordered that T.H. be picked up at 6pm on the eve of trial and spend the night at a hotel close to the courthouse.

forcible compulsion, attempt -- involuntary deviate sexual intercourse and sexual assault. Sentencing was deferred for an assessment to determine whether or not appellant met the criteria to be classified as a Sexually Violent Predator (SVP) pursuant to Pennsylvania's Registration of Sexual Offenders Act, Megan's Law III, 42 Pa.C.S. §9791 et seq. N.T., 7/12/10, p. 105. On March 2, 2011 the appellant was classified as an SVP and sentenced to serve not less than 16 nor more than 40 years in a state correctional institution, followed by a period of probation of not less than 5 years.

On April 4, 2011, appellant timely filed a notice of appeal and was thereafter directed to file a concise statement of errors complained of on appeal.

## II. STATEMENT OF ERRORS COMPLAINED OF ON APPEAL

On April 26, 2011, in accordance with Pa.R.A.P. 1925(b), petitioner, filed a statement of errors complained of on appeal, set forth verbatim herein:

1. The court committed an error of law in allowing the Commonwealth to exercise a preemptory [sic] strike during voir dire, to remove a female African American jury panelist, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

2. The court committed an error of law in allowing the Commonwealth to introduce evidence at trial concerning the defendant's alleged and unproven affiliation with the "Bloods" gang.

3. The court committed an error of law in abusing its

sentencing discretion by sentencing the defendant to an aggregate term of incarceration of not less than sixteen (16) nor more than forty (40) years.

Statement of errors complained of on appeal, ¶ 2a-2c (Apr. 26, 2011).

## III. DISCUSSION

### A. *Batson Objection*

The ultimate goal of the jury selection process is to ensure that the defendant is tried by a fair and impartial jury of his peers. In order to further this goal, two methods have been devised to eliminate unsuitable jurors — the challenge for cause and the peremptory challenge. While the Commonwealth and defense counsel may make an unlimited number of challenges for cause, they are permitted a limited number of peremptory challenges. The primary function of the peremptory challenge is to allow parties to strike prospective jurors who they have good reason to believe might be biased but who are not so clearly and obviously partial that they could otherwise be excluded from the panel. *Commonwealth v. Jackson*, 562 A.2d 338, 342 (Pa. Super. 1989).

In *Swain v. Alabama*, the United States Supreme court first recognized that the racially motivated use of peremptory challenges could rise to the level of a constitutional violation. In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court reconsidered the *Swain* decision,[11] and developed a new procedure for

---

11. The *Swain* court's principal concern was to ensure that the prosecution's jury selection practices would not be unduly restricted. The court emphasized that "the presumption in any particular case

evaluating challenges to the prosecution's use of peremptory strikes. Under *Batson*, a defendant may rely exclusively on the facts of his own case when proving a constitutional violation. In order to prevail, the defendant must initially establish a prima facie case of discrimination.

A prima facie case of discrimination has three elements: 1) the defendant's membership in a cognizable racial group; 2) the prosecutor's use of peremptory strikes to exclude members of that group; and 3) an inference arising under the totality of the circumstances that the prosecutor used the strikes to exclude venirepersons on account of race. See *Commonwealth v. Abu-Jamal*, 521 Pa. 188, 197, 555 A.2d 846, 850 (1989). If a defendant makes a prima facie showing of discrimination, the burden then shifts to the prosecution to justify his decision to strike minority jurors. "The prosecutor must therefore articulate a neutral explanation related to the particular case to be tried." *Batson*, 476 U.S. at 98 (footnote omitted). The trial judge must then make the ultimate determination of whether the defendant has established purposeful discrimination. *Id.*

In the present case, the appellant is African-American. During the selection of jury members in this case, after a

---

must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury" 380 U.S. at 222. The court further held that this presumption could only be overcome by evidence that the prosecutor systematically excluded members of a particular racial group from juries "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be...." 380 U.S. at 223. This evidentiary standard was extensively criticized since it imposed a virtually insurmountable burden of proof on defendants and prevented courts from remedying nearly all of the equal protection violations which occurred during the voir dire process. See, e.g., *Commonwealth v. Martin*, 461 Pa. 289, 298-300, 336 A.2d 290, 294-96 (1975) (Nix, J., dissenting).

peremptory strike was exercised by the Commonwealth, appellant's counsel raised a timely objection:

> [Appellant's Counsel]: Your Honor, I would just indicate that I've been passed the jury panel request list, and I note that the prosecution struck juror number 21, who is one of two African American individuals on the panel, and I would just request at this time that the Commonwealth state on the record the reason for that strike.

N.T., 7/7/10, p. 57. At which point the Commonwealth articulated a neutral explanation for the strike of jury number 21:

> MS. SIEGLE: We are noting on her questionnaire that she said she would be less likely to believe the testimony of a police officer.
>
> ***
>
> MS SIEGLE: If I may add to the record, we did not strike her on the basis of race. We will note also that our victim is African American.

N.T., 7/7/10, p. 57-60. As the present case was one in which a sufficient portion of the testimony presented would be that of law enforcement officers, the Commonwealth effectively articulated a neutral explanation related to the case.

Appellant has failed to articulate any facts that would give rise to the inference that the prosecutor used a strike to exclude a venireperson on account of race. It is clear that a record was established at the time the objection was raised, and the court was given an opportunity to consider

the totality of the circumstances presented. As this court properly determined at the time, the appellant failed to establish a prima facie case of exclusion based on race and, therefore, this claim is without merit.

## B. *Bloods Affiliation*

In the course of her testimony, T.H. was allowed to testify regarding statements appellant made about his affiliation with the Bloods gang. Under the Pennsylvania Rules of Evidence, the general rule is that hearsay, an out of court statement offered for the truth of the matter asserted, is not admissible as evidence. Pa.R.E. 802. However, an exception is made for admissions of a party-opponent, the statement of a party, offered against the party that is the party's own statement. Pa.R.E. 803(25). These statements, known as admissions, become substantive evidence pursuant to this rule. See *Commonwealth v. Tervalon*, 345 A.2d 671 (Pa. 1975). An admission need not be made to the opposing party in order to be admissible, but it must be relevant to the issues on trial. See *Whitman v. Riddell*, 471 A.2d 521 (Pa. Super. 1984); *ACE American v. Lloyds*, 939 A.2d 935 (Pa. Super. 2007), aff'd 971 A.2d 1121 (Pa. 2009).

Party admissions are not subject to hearsay exclusion because:

It is fair in an adversary system that a party's prior statements be used against him if they are inconsistent with his position at trial. In addition, a party can hardly complain of his inability to cross-examine himself. A party can put himself on the stand and explain or contradict his former statements.

*Commonwealth v. Chmiel*, 558 Pa. 478, 504, 738 A.2d 406, 420 (1999), cert. denied, 528 U.S. 1131 (2000) (citing Packel & Poulin, Pennsylvania Evidence § 805 (1987)). Thus, in criminal cases, this Pennsylvania Supreme Court has consistently held that a defendant's out-of-court statements are party admissions and are exceptions to the hearsay rule. *Commonwealth v. Paddy*, 569 Pa. 47, 76, 800 A.2d 294, 312 n. 11 (2002); *Commonwealth v. Laich*, 566 Pa. 19, 26, 777 A.2d 1057, 1060 (2001).

The testimony offered at trial in regards to the Bloods were statement's appellant himself made to T.H.:

Q: Did he mention to you at some point that...he was a member of a gang?

A: Yes.

\*\*\*

Q: What gang did he tell you he was a member of?

A: Of the Bloods.

N.T., 7/7/10, p. 117. T.H. further testified about her personal observations, and appellant's explanations:

Q: Did you see anything in the car in the nature of a bandana?

A: Yes.

Q: Where was that?

A: In the back seat.

Q: And what color was it?

A: Red.

Q: What did the defendant tell you about that?

A: That he had to wear that on his hand for 31 days.

Q: As part of --

N.T., 7/7/10, p. 118-19. At which point appellant's counsel objected and requested that counsel be allowed to approach the bench. A conversation occurred at sidebar and was recorded:

MS. SIEGLE: I asked her what he told her the reason he had to wear a bandana on his wrist for 30 days, and the anticipated answer would be as part of his membership with the Bloods, which again is not offered for the truth of the matter asserted but for the effect on the listener.

THE COURT: It's not a matter of hearsay because it would be a statement from him.

MR. PENGLASE: We have a pretrial ruling on this. There's not to be any admission of evidence that he is actually a gang member.

THE COURT: I thought the ruling was she was allowed to present testimony of his statements about him being involved in a gang because it was essentially part of the whole threatening sort of thing.

\*\*\*

THE COURT: Isn't the purpose here to establish her state of mind to show was she was scared of him?

[Appellant's Counsel]: I'm sure that's what it is. The problem is this piece about the bandana makes it suggest that he is actually a gang member and - in other words,

it's substantive proof that he's a Blood, which I thought it was we weren't going to do.

N.T., 7/7/10, 119-20. The jury was removed from the courtroom and the parties openly presented further argument on the matter. The court, based on the admissions of a party-opponent exception to the hearsay rule, properly determined that the testimony the Commonwealth sought to present was admissible and allowed the following:

BY MS. SIEGLE:

Q: Ms. Hawkins, did the defendant tell you that he had to wear this bandanna on his wrist for 30 days as part of his membership in the Bloods gang?

A: Yes.

N.T., 7/7/10, p. 126. In allowing this testimony the court complied with the Pennsylvania Rules of Evidence.

As the court stated, these statements by appellant were statements that were either intended to be part of a threat, or were perceived to be part of a threat, and as such are relevant to the issues on trial. As the statements admitted were properly admitted under the admissions by a party-opponent exception to the hearsay rule, appellant's claim is without merit.

C. *Sentencing*

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed absent manifest abuse of discretion. *Commonwealth v. Johnson*, 666 A.2d 690, 693 (Pa. Super. 1995). An appellant must establish that the sentencing court ignored

or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill-will, or arrived at an unreasonable decision. *Commonwealth v. Rodda,* 723 A.2d 212, 214 (Pa. Super. 1999). This discretion is permitted because the trial court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. *Commonwealth v. Mouzon,* 571 Pa. 419, 812 A.2d 617 (2002).

"An appellate court will not disturb the lower court's judgment absent a manifest abuse of discretion. In order to constitute an abuse of discretion, a sentence must either exceed the statutory limits or be so manifestly excessive as to constitute an abuse of discretion. Further, a sentence should not be disturbed where it is evident that the sentencing court was aware of sentencing considerations and weighed the considerations in a meaningful fashion." *Commonwealth v. Fish,* 752 A.2d 921, 923 (Pa. Super. 2000). (citation and internal quotations omitted). The sentencing guidelines are advisory, and when justified, a court acts well within its discretion to sentence outside the recommended ranges. *Commonwealth v. P.L.S.,* 894 A.2d 120, 128 (Pa. Super. 2006).

Where an excessive sentence is based on a deviation from the sentencing guidelines, the sentencing court must demonstrate an understanding of the suggested sentencing range. *Commonwealth v. Mouzon,* 828 A.2d 1126, 1128 (Pa. Super. 2003). The sentencing court may deviate from the guidelines when taking into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the offenses along with their impact

on individuals and the community. *Id.* The sentencing court must state, on the record, the factual basis and specific reasons which compelled him to deviate from the guidelines. *Id.*

The sentencing guidelines for the charges in this case called for the following sentences in the standard range: Attempt - Involuntary Deviate Sexual Intercourse, the minimum mandatory ten years; rape, 72 to 90 months; Terroristic Threats, 3 to 14 months; and False Imprisonment, RS to six months. These guidelines recommend a sentence with a minimum of approximately sixteen years, the sentence handed down by the court. The presentence investigation recommended a sentence of 20 to 40 years. The court placed the following reasons for its sentence on the record:

> THE COURT: Taking into consideration many factors in imposing this sentence, that most significant of which, obviously, are the acts committed upon the victim in this matter, the jury found credible evidence sufficient to establish beyond a reasonable doubt that you raped this woman by force, that you threatened her life, and that you made these threats with the intent to commit these acts and then to prevent her from reporting them to the authorities. These are among the most serious offenses that can be committed upon another human being. It's difficult to comprehend the fear this woman was forced to undergo during the course of these events. Those acts are the primary reason for the sentence that I will impose.
>
> Obviously in imposing this sentence I take into consideration the sentencing guidelines that are

presented to me. I take into consideration the information presented in the presentence [investigation] that discusses many of the items as outlined by [defense counsel], together with his prior criminal conduct, which while one might argue does not contain matters of great offense in the grand scheme of criminal conduct, that's a matter of argument. And I suspect there is some disagreement as to the weight and seriousness of those acts.

But what is of significance to me and that I take and give great consideration to is the fact that you were provided many opportunities from the time you were 15, up to and including the time this night occurred to change your ways. You were adjudicated delinquent at 15, placed on probation, provided services of some form for a sexually related offense. There were other matters as a youth for which you received various consequences, fines and probation, none of which - none of which cause you to be rehabilitated. Normally, in my experience, that is because the person doesn't have the desire to be rehabilitated, doesn't have the drive to do so.

And then you continued throughout your adult life getting caught periodically and convicted, but over time there were gaps, two, three years here, three, four years there. But you were given fines; they didn't stop you. You thought you could go ahead and ignore the laws of the State of New Jersey. You were given probation. You didn't accept that and continued to violate the laws. You were given periods of 35 days or 300 days, and those sort of things did not convince you that there was

another path that you could [choose].

And then you engaged in robbery. Three separate counts, I see. Might be three different victims. I'm not sure. But you got what is the equivalent here in Pennsylvania of a five to ten year sentence, served five years in jail, and got out. And while on parole, while on supervision, you committed those acts. That tells me there that the likelihood that you are a person who can be rehabilitated will likely not be met with any level of success.

What I really believe, Mr. Williams, is that you are a person who believes you're entitled to whatever you want, and you will take whatever steps that are necessary to obtain those. Maybe on this night it was your intent originally to have consensual sex. I don't know. But maybe when it didn't become the scenario you envisioned and, in fact, came to one of rejection, you resorted to violence and threats. And you held some woman against her will and raped her.

Those are the factors that are to be considered along with those mitigating factors presented.

On this Bill of Information, as to count five, the charge of criminal attempt to commit the offense of involuntary deviate sexual intercourse by forcible compulsion, for which the Commonwealth has invoked the mandatory, it's ordered and directed as follows:

You're to pay the costs of prosecution, undergo imprisonment at a state correctional institution for a period of not less than ten nor more than 20 years....

On count two, that of rape by threat of forcible compulsion, it's ordered and directed that you pay the costs of prosecution, undergo imprisonment in a state correctional institution for a period of not less than six nor more than 20 years. That sentence is to run consecutive to and not concurrent with the sentence imposed on count five.... On count 17, terroristic threats, it's ordered and directed that you are placed on a period of probation for five years. That will run consecutive to and not concurrent with the sentences imposed on the two preceding counts.

Lastly, on the offense of false imprisonment, it's ordered and directed that you pay the costs of prosecution, and you're placed on probation for a period of two years. That probation will run concurrent with and not consecutive to probation for terroristic threats.

N.T., 3/2/11, p. 69-74. It is important to note that the sentence imposed by the court does not exceed the statutory limits, nor can it be considered manifestly excessive. Appellant was not a first-time offender, and the offenses committed in this case were "among the most serious offenses that can be committed upon another human being." N.T., 3/2/11, p. 70. Further, no mitigating factors were presented.

The sentence handed down by the court was within the sentencing guidelines, deviating only slightly on the upper end of the sentence imposed on count two. In imposing a sentence, the court showed thorough consideration of the protection of the public, appellant's rehabilitative needs, and the gravity of the offenses along with their impact on the victim and the community. Therefore, appellant's

claim that the court's sentence was an abuse of discretion is without merit.

## CONCLUSION

For the foregoing reasons we find that the issues that appellant raised in this appeal are without merit.