J-S98001-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| WESLEY COOK | : | |
| | : | |
| Appellant | : | No. 1206 EDA 2023 |

Appeal from the PCRA Order Entered March 31, 2023
In the Court of Common Pleas of Philadelphia County
Criminal Division at No:  CP-51-CR-0113571-1982

BEFORE:  PANELLA, P.J.E., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY STABILE, J.:            **FILED SEPTEMBER 10, 2024**

Petitioner, Wesley Cook (also known as Mumia Abu-Jamal), appeals an order dismissing his petition for postconviction relief.[1]  In 1982, following a jury trial, Petitioner was found guilty of the first-degree murder of Officer Daniel Faulkner.  Petitioner was sentenced to death in 1983, but that sentence was later vacated, and a term of life was imposed.  Several successive postconviction petitions were then filed in the years after the judgment of sentence became final.  In his most recent petition filed in 2021 (his sixth), Petitioner claims that new evidence entitled him to a new trial.  This was based on the recent disclosure of a letter written by a witness to the lead prosecutor asking for money owed to him, as well as notations by the prosecutor

_____

[1] Petitioner's claims are governed by the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.

regarding the race of prospective jurors. The Court of Common Pleas of Philadelphia County (PCRA court) dismissed the petition without a hearing. Finding no basis to disturb that ruling, we affirm.

The underlying facts of the case have previously been summarized as follows:

> [A]t approximately 3:55 a.m. on December 9, 1981, Officer Faulkner made a routine car stop on Locust Street between Twelfth and Thirteenth Streets in Center City Philadelphia. The car was driven by the [Petitioner's] brother, William Cook. After making the stop, Officer Faulkner called for assistance on his police radio, requesting a police wagon to transport a prisoner. While Faulkner was trying to handcuff Cook, [Petitioner] ran from across the street and shot the officer once in the back. Faulkner was able to fire one shot, which wounded [Petitioner], but after Faulkner had fallen to the ground [Petitioner] shot him four more times at close range, once through the center of the face. [Petitioner] was found slumped against the curb in front of Cook's car and taken into custody by police officers who arrived on the scene within thirty to forty-five seconds. The officers had been in the area and were turning onto Locust Street from Twelfth Street in response to Faulkner's radio request. They were flagged down by a cab driver [Robert Chobert,] who had witnessed the shooting while stopped at the intersection of Thirteenth and Locust. Two other pedestrians also witnessed the incident and identified [Petitioner] as the perpetrator, both at the scene and during the trial.

***Commonwealth v. Abu-Jamal***, 555 A.2d 846, 848 (Pa. 1989) (affirming judgment of sentence on direct appeal).

Additionally, when Petitioner was apprehended at the scene of the shooting, he was wearing a gun holster. A handgun sold to Petitioner, and registered in his name, was laying on the ground a few inches away from him. When Petitioner was transported to a hospital for the treatment of his gunshot

wound, multiple witnesses testified at trial that they heard him admit to shooting Officer Faulkner, and express his hope that he was dead. *See* N.T. Trial, 6/24/1982, 28-30, 33, 113-16, 135-36.

The jury found Petitioner guilty, and he was sentenced to death. The judgment of sentence was upheld on direct appeal in 1989. ***See Abu-Jamal***, 555 A.2d at 848. Petitioner then filed PCRA petitions in 1995, 2001, 2003, and 2009. The first petition was denied after the PCRA court held an evidentiary hearing. The second, third, and fourth petitions were dismissed as untimely. In each of these four proceedings, the appeal was immediately heard by the Pennsylvania Supreme Court,[2] and the denial of relief was upheld in each instance. ***See Commonwealth v. Abu-Jamal***, 720 A.2d 79 (Pa. 1998) (affirming denial of first PCRA petition); ***Commonwealth v. Abu-Jamal***, 833 A.2d 719 (Pa. 2003) (affirming denial of second PCRA petition); ***Commonwealth v. Abu-Jamal***, 941 A.2d 1263 (Pa. 2008) (affirming denial of third PCRA petition); ***Commonwealth v. Abu-Jamal***, 40 A.3d 1230 (Pa. 2012) (affirming denial of fourth PCRA petition).

After obtaining federal *habeas corpus* relief, Petitioner's death penalty was overturned, and he was resentenced in 2012 to a prison term of life without parole. On appeal, Petitioner's life sentence was affirmed by this

---

[2] 42 Pa.C.S.A. § 9711(h)(1) mandates that in cases where party has been sentenced to death, his claims "shall be subject to automatic review by the Supreme Court of Pennsylvania[.]"

Court.  *See Commonwealth v. Abu-Jamal*, 3059 EDA 2012, 2013 WL 11257188 (Pa. Super. filed July 9, 2013) (unpublished memorandum).

In 2016, Petitioner filed his fifth PCRA petition, this time claiming that his appellate rights from the four earlier PCRA proceedings had to be reinstated pursuant to the United States Supreme Court's decision in *Williams v. Pennsylvania*, 579 U.S. 1 (2016).  In that case, the defendant was found guilty of first-degree murder and sentenced to death.  The Honorable Ronald Castille was the District Attorney of Philadelphia at the time of the trial, and he had authorized prosecutors to seek the death penalty.

The defendant in *Williams* filed a PCRA petition seeking a new penalty-phase trial, and that request was granted by the PCRA court.  The Pennsylvania Supreme Court reviewed the ruling, and by the time the Court heard the appeal, the Chief Justice was the Honorable Ronald Castille, who refused to recuse himself from the case.  Our Supreme Court reversed the award of relief and reinstated the defendant's death penalty.  However, on further review before the United States Supreme Court, it was found that Justice Castille's refusal to recuse despite his "significant, personal involvement in a critical trial decision" had "presented an unconstitutional risk of bias" in the PCRA proceedings.  *Williams*, 579 U.S. at 11.  Our Supreme Court's opinion was vacated, and the Court was directed to reconsider the defendant's appeal without Justice Castille's participation.  *See id*., at 17.

After the *Williams* opinion was issued, Petitioner relied on it to contend that Justice Castille's participation in the appellate review of his own cases

constituted a similar constitutional violation. In 2018, the PCRA court directed the Commonwealth to produce its entire case file from the trial, and 32 boxes of records were submitted. On January 3, 2019, the Commonwealth disclosed for the first time that it had discovered another six boxes of previously undisclosed documents.

During a review of the newly disclosed materials, it was discovered that in 1990, Justice Castille (in his prior role as District Attorney) had sent a letter to the governor advocating for the execution of death row inmates who had murdered a police officer. The PCRA court found that this letter was new evidence that raised an appearance of bias and impropriety. Petitioner's appellate rights as to his first four PCRA petitions were reinstated on that ground.

However, on further review, this Court held that the prior appeals had erroneously been reinstated because Justice Castille's letter to the governor did not demonstrate any personal interest in the outcome of Petitioner's case. As such, the letter did not qualify as newly discovered evidence which would exempt Petitioner's claims from the PCRA's time-bar. The four appeals were therefore dismissed for lack of jurisdiction. *See Commonwealth v. Cook*, No. 290 EDA 2019 (Pa. Super. filed October 26, 2021) (unpublished memorandum) (vacating order granting reinstatement of Petitioner's prior PCRA appeals).

Although the issues raised in the prior PCRA proceedings are not directly before us, they are nonetheless significant because they resulted in the new

disclosures that now form the basis of Petitioner's present claims. On December 23, 2021, once the appeal at docket number 290 EDA 2019 had concluded, Petitioner filed his most recent PCRA petition (his sixth), alleging that the newly disclosed evidence from the Commonwealth's case files established violations of the constitutional rights at issue in ***Brady v. Maryland***, 373 U.S. 83 (1963), and ***Batson v. Kentucky***, 476 U.S. 79 (1986).

The ***Brady*** claim was based on the discovery of a letter written by an eye-witness (Robert Chobert) in which he asked the sole prosecutor at trial (Joseph McGill, Esq.) about money he was "owed." The letter was postmarked on August 6, 1982, about one month after the trial had concluded. It reads in its entirety as follows:

> Mr. McGill, I have been calling you to find out about the money ow[ed] to me. So here is a letter, finding out about money. Do you need me to sign anything[?] How long will it take to get it[?] How was your week off good I hope.

PCRA Petition, 12/23/2021, Exhibit B.

In response to the disclosure of Chobert's letter, McGill submitted an affidavit on November 18, 2019. ***See*** PCRA Petition, 12/23/2021, Exhibit C. McGill averred that he had never promised Chobert "anything of value in exchange for his testimony," and that when Chobert asked if he could be compensated for lost wages at the conclusion of the trial, McGill "responded politely that [he] would look into it." ***Id***. However, McGill did not follow up on Chobert's request because it was against his office's policy. ***See id***.

Further, McGill stressed that Chobert's motivation to testify could not have been based on a payment because he had come forward immediately to identify Petitioner as the shooter at the scene of the crime. ***See id***.

The ***Batson*** claim was based on Petitioner's discovery that McGill had noted the race of potential jurors at the trial, designating them with the letter "W" (White) or the letter "B" (Black). Petitioner, who is Black, argued that the notations demonstrated the Commonwealth's strategy to exclude members of his race from the jury.

The PCRA court heard argument from the parties on October 26, 2022. On that date, the PCRA court issued a notice of its intent to dismiss the petition without an evidentiary hearing. ***See*** Pa.R.Crim.P. 907. Petitioner and the Commonwealth both filed responses, and additional argument was heard on December 16, 2022.

The PCRA court dismissed the sixth PCRA petition without a hearing. In its 1925(a) opinion, the PCRA court found that the ***Brady*** claim lacked merit because the letter was not impeachment material or exculpatory, much less material to the conviction; the ***Batson*** claim was found to be both waived and without merit because McGill's *voir dire* notes did not reveal an intent to make any peremptory strikes on the basis of race. ***See*** PCRA Court 1925(a) Opinion, 7/11/2023, at 8-29. Petitioner timely appealed, and in his brief, he now raises two issues for our consideration:

> 1. Was the PCRA court in error when it dismissed [Petitioner's] ***Brady*** claim on materiality grounds, without a hearing, when the

- 7 -

claim presented evidence of a previously withheld agreement or understanding between the Commonwealth and the Commonwealth's principal witness, Robert Chobert, that Mr. Chobert would receive financial compensation for his testimony on behalf of the Commonwealth at [Petitioner's] trial[?]

2. Was the PCRA court in error when it dismissed [Petitioner's] **Batson** claim, without a hearing, on the grounds that the claim was untimely and waived, when [Petitioner] could not have raised the claim previously because it is premised on significant new evidence that the prosecutor was motivated by race in exercising peremptory strikes; the Commonwealth withheld that evidence from [Petitioner] for over three decades; and [Petitioner] diligently sought to uncover facts in support of his **Batson** claim in prior proceedings[?]

Petitioner's Brief, at 1-2.

A postconviction claim warrants PCRA relief only if a petitioner "pleads and proves by a preponderance of the evidence" that (1) his conviction or sentence resulted from one of the grounds outlined in 42 Pa.C.S.A. § 9543(a)(2), and the claim has not been previously litigated or waived. **See** 42 Pa.C.S.A. § 9543(a)(3). Of relevance in the present proceedings, a petitioner is eligible for relief where a conviction resulted from "[a] violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543 (a)(2)(i).

Under the PCRA, all petitions, "including a second or subsequent petition," must be filed within one year of the date that the judgment of sentence in the case became final. 42 Pa.C.S.A. § 9545(b). A statutory

- 8 -

exception to the time-bar must be invoked "within one year of the date the claim could have been presented." 42 Pa.C.S.A. § 9545(b)(2).

Petitioner's judgment of sentence became final in 1991, and the present PCRA petition was filed about 30 years later. Accordingly, Petitioner needed to satisfy one of the enumerated exceptions to the PCRA's time-bar in order for the merits of his claims to be considered.

When reviewing the denial of PCRA relief, an appellate court "is limited to determining whether the PCRA court's findings are supported by the record and without legal error." *Abu-Jamal*, 941 A.2d at 1267*.* This Court may affirm if there is any basis in the record to support the PCRA court's decision. *See Commonwealth v. Smith*, 194 A.3d 126, 131 (Pa. Super. 2018).

A PCRA court may dismiss a PCRA petition without a hearing as long as the record supports the finding that the petitioner failed to raise a genuine issue of material fact as to his entitlement to relief:

> The PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings." *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 442 (2011) (quoting Pa.R.Crim.P. 909(B)(2)). "To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *Id.* (quoting *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 820 (2004)). We stress that an evidentiary hearing "is not meant to function as a fishing expedition for any possible evidence that may

support some speculative claim[.]" *Commonwealth v. Jones*, 571 Pa. 112, 811 A.2d 994, 1003 n.8 (2002) (citation omitted).

*Commonwealth v. Roney*,79 A.3d 595, 604–05 (Pa. 2013).

Petitioner's first issue on appeal is that the PCRA court erred in dismissing his *Brady* claim without an evidentiary hearing because Chobert's letter to McGill created a genuine issue of fact as to whether his constitutional rights were violated.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To prove a *Brady* violation, it must be shown that "(1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant." *Commonwealth v. Haskins*, 60 A.3d 538, 547 (Pa. Super. 2012) (citation omitted).

The burden of establishing a *Brady* violation "rests with the defendant to prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Commonwealth v. Hutchinson*, 25 A.3d 277, 310 (Pa. 2011). "The withheld evidence must have been in the exclusive control of the prosecution at the time of trial." *Haskins*, 60 A.3d at 547. However, "[n]o

*Brady* violation occurs when the defendant knew, or with reasonable diligence, could have discovered the evidence in question." *Id*. (citing *Commonwealth v. Paddy*, 15 A.3d 431, 451 (Pa. 2011)).

"The *Brady* rule extends to impeachment evidence including any potential understanding between the prosecution and a witness, because such information is relevant to the witness' credibility." *Commonwealth v. Wholaver*, 177 A.3d 136, 158 (Pa. 2018). A *Brady* violation is only "material," and therefore prejudicial, if "constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (internal citations omitted). Our Supreme Court has summarized a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* at 783–84 (citation omitted). In this analysis,

> [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense.

*Id*., at 158–59 (internal citations and quotations omitted).

As to the timing of a *Brady* claim at the postconviction stage, our Supreme Court has noted that

> [a]lthough a *Brady* violation may fall within the governmental interference exception [of the PCRA], the petitioner must plead

- 11 -

and prove the failure to previously raise the claim was the result of interference by government officials, and the information could not have been obtained earlier with the exercise of due diligence. Section 9545(b)(1)(ii)'s exception requires the facts upon which the **Brady** claim is predicated were not previously known to the petitioner and could not have been ascertained through due diligence. In [**Commonwealth v. Bennett**, 930 A.2d 1264, 1271 (Pa. 2007)], we clarified that § 9454(b)(1)(ii)'s exception does not contain the same requirements as a **Brady** claim, noting "we made clear the exception set forth in subsection (b)(1)(ii) does not require any merits analysis of the underlying claim. Rather, the exception merely requires that the 'facts' upon which such a claim is predicated must not have been known to appellant, nor could they have been ascertained by due diligence."

**Commonwealth v. Abu-Jamal**, 941 A.2d 1263, 1268 (Pa. 2008) (citations omitted).

Here, we find initially that Petitioner timely raised his **Brady** claim. It is undisputed that Petitioner's judgment of sentence became final decades ago, and that he had to establish one of the exceptions to the PCRA's time-bar in order to assert his new claims in 2021. Petitioner invoked the governmental interference (42 Pa.C.S.A. § 9545(b)(1)(i)) and newly discovered evidence exceptions (42 Pa.C.S.A. § 9545(b)(1)(ii)) of the PCRA. Under either exception, Petitioner had to file his claim within one year from the date upon which he learned of the claim's factual basis; he also had to show that the grounds for the claim could not have been discovered sooner through the exercise of due diligence. **See Abu-Jamal**, 941 A.2d at 1268.

We agree with the PCRA court that Petitioner's **Brady** claim was timely filed. **See** PCRA Court Notice of Intent to Dismiss, 10/26/2022, at 19 n.20.

- 12 -

The Commonwealth did not turn over the case files containing Chobert's letter until January 3, 2019, and Petitioner filed the present petition as soon as was procedurally permitted.[3] Prior to the discovery of the letter, Petitioner acted with due diligence, having sought unsuccessfully to obtain such evidence at the PCRA proceedings in 1995. *See id*. Thus, since the claim was timely filed, it is not procedurally barred.

Turning to the merits of the claim, we also agree with the PCRA court that Chobert's letter was not evidence of a *Brady* violation or otherwise material because it did not establish a fact which would impeach Chobert's credibility.

Under the PCRA, a petitioner has the initial burden of identifying the evidence that establishes the right to relief. *See* 42 Pa.C.S.A. §9543(a) (requiring that a petitioner "must plead and prove" his claim.). But here, the only evidence Petitioner put forward is Chobert's letter, in which the witness asked the prosecutor about money he believed he was owed. It is entirely speculative to assume, as Petitioner does, that the letter proves McGill promised Chobert money in exchange for his testimony. *See e.g., Commonwealth. v. Dickerson*, 900 A.2d 407, 411 (Pa. Super. 2006) (finding that alleged *Brady* violation did not establish governmental

---

[3] Petitioner learned of Chobert's letter while an earlier PCRA petition was still pending. He filed his present PCRA petition as soon as that prior petition was fully adjudicated, making it timely. *See Commonwealth v. Lark*, 746 A.2d 585, 588 (Pa. 2000).

interference exception to the PCRA time bar because it was "nothing but pure speculation.").

Witnesses at a trial are statutorily entitled, under 42 Pa.C.S.A. § 5903, to compensation for their participation. This statute provides that a witness "shall be paid at the rate of $5 per day during the necessary period of attendance," 42 Pa.C.S.A. § 5903(b), and that even if he is not called to testify, he is entitled to this compensation while attending the matter under subpoena. *See* 42 Pa.C.S.A. § 5903(g).[4]

In light of this statute, there is nothing facially, or *per se*, improper about Chobert asking for compensation once the trial had concluded. Chobert testified both at a pretrial suppression hearing, which took place over four days, and at Petitioner's trial, which lasted two weeks. Due to concerns over his safety, Chobert had to be housed in a hotel during those proceedings. Once the trial concluded, he was owed monetary compensation as a matter of law. His request for renumeration, alone, is therefore *not* evidence that he was being paid to testify. Thus, the trial court did not err in determining that

_____

[4] 42 Pa.S.C.A. § 5903(g) provides that "[a] witness who attends any matter under subpoena, but who is not called to testify therein, shall receive the same compensation and expenses as if actually called to testify." The statute provides further that, "[t]he person disbursing compensation and expenses to a witness under this section may require that the witness first certify under 18 Pa.C.S. § 4904(b) (relating to statements "under penalty") that the compensation and expenses paid do not exceed the amount specified by this section." 42 Pa.S.C.A. § 5903(i).

Petitioner had failed to carry his burden of raising a question of fact whether a **Brady** violation occurred.[5]

Even assuming that Chobert's letter could conceivably constitute impeachment evidence under **Brady**, we would find, like the PCRA court did, that it was not material. Again, Chobert immediately identified Petitioner at the scene as the person who shot Officer Faulkner, and he did so before he ever met McGill. Chobert testified consistently at Petitioner's trial, in his out-of-court statements to police, and at Petitioner's initial PCRA proceedings in 1995. The Pennsylvania Supreme Court and the federal district court both recognized the consistency of Chobert's identification of Petitioner as the person who fatally shot Officer Faulkner. **See Abu-Jamal**, 720 A.2d at 96; **Abu-Jamal**, 2001 WL 1609690 at *23 ("A review of the record also demonstrates that Chobert's statements consistently indicated that the shooter and another man moved from the shooting scene, that they were apprehended, [and] that Chobert was positive about his identification of petitioner as the shooter[.]").

_____

[5] McGill stated in his affidavit of November 18, 2019, that he recalled Chobert approaching him after the trial had concluded to ask if he could be compensated for the wages he had lost as a result of not being able to work during the trial. McGill stated that he told Chobert he would "look into it," but ultimately he did not follow up with Chobert on this point because it was inconsistent with the policies of his office. Petitioner has submitted no evidence which refutes McGill's assertions. **See** PCRA Petition, at Exhibit C.

- 15 -

Aside from Chobert's identification, there was other compelling evidence of Petitioner's guilt which is noticeably absent from the recitation of facts in his briefing before us. This included several witnesses who testified to hearing Petitioner admit to shooting Officer Faulkner and hoping he was dead. A hospital security guard, Priscilla Durham, and a police officer, Gary Bell, both testified at trial that they overheard Petitioner make this declaration. *See* N.T. Trial, 6/19/1982, at 176-200, 263-64; N.T. Trial, 6/21/1982, at 4, 109; N.T. Trial 6/24/1982, at 27-30, 33-34, 56-61, 112-16, 133-36. A third witness, Officer Wakshul testified at the PCRA hearing held on August 1, 1995, that Petitioner admitted to shooting Faulkner.[6]

Additionally, Petitioner was arrested moments after Officer Faulkner called for backup. When backup arrived, a handgun was laying a few feet away from Petitioner at the scene of the shooting. The weapon was bought by and registered to Petitioner, who was wearing an empty gun holster when apprehended at the scene. Petitioner had also been shot in the chest by

_____

[6] Petitioner has previously attempted to impeach the Commonwealth's witnesses on various grounds, none of which have been successful. In his first PCRA petition, in particular, he argued that the Commonwealth had committed a *Brady* violation by not having Officer Wakshul testify at trial. Even though the officer had reportedly heard Petitioner's admission, he had given arguably inconsistent statements that no such admission had been heard. Our Supreme Court rejected that ground for postconviction relief. *See Abu-Jamal*, 720 A.2d at 92-93. As to the second eye-witness, Cynthia White, Petitioner argued that the Commonwealth had failed to disclose an alleged deal between her and prosecutors in which she would testify in exchange for leniency in her own pending cases. Our Supreme Court also found this claim to be meritless. *See id*., at 93-94.

Officer Faulkner during the incident, and the bullet recovered from Petitioner's body was the only round discharged from Officer Faulkner's weapon. Under these circumstances, the Commonwealth's delayed disclosure of Chobert's post-trial letter to McGill does not undermine our confidence in the outcome of the trial.

Lastly, we address Petitioner's argument that he presented enough evidence of a *Brady* violation to raise a material issue of fact, requiring the PCRA court to hold an evidentiary hearing. For reasons similar to those outlined above, we find that the PCRA court did not err in this regard.

Chobert's letter does not raise a question of fact as to whether a *Brady* violation occurred, and it is not clear what legitimate purpose an evidentiary hearing would have served. In his affidavit, McGill averred that no money had been paid to Chobert in exchange for his testimony. Chobert himself, at the PCRA hearing in 1995, denied that he had testified against Petitioner in exchange for any favors promised by the Commonwealth.[7]

No other evidence or witnesses have been proffered by Petitioner that supports his *Brady* claim or contradicts the statements given by Chobert and

---

[7] Petitioner had made a *Brady* claim in his first PCRA petition, asserting that the Commonwealth had failed to disclose that Chobert had testified at trial in exchange for having his suspended driver's license reinstated. *See Commonwealth v. Abu-Jamal*, 720 A.2d 79, 95-96 (Pa. 1998). Although Chobert testified that he had asked McGill to help him reinstate his license, Petitioner failed to produce any evidence that Chobert ever received that benefit. In fact, as of the hearing in 1995, which was over a decade after the trial had ended, Chobert's license still had not been restored. *See id*., at 96.

McGill regarding the allegation of an improper payment for false testimony. Petitioner therefore failed to carry his burden of putting forth evidence of a **Brady** violation such that an evidentiary hearing was required, and the PCRA court did not err in denying a hearing on the **Brady** claim. **See Roney**, 79 A.3d at 604–05.

Petitioner's second claim is that he was entitled to postconviction relief based on a portion of prosecutor McGill's jury-selection notes, which show that during *voir dire* he recorded the race of prospective jurors. In **Batson**, the United States Supreme Court held that a defendant's equal protection rights[8] are violated where a prosecutor exercises peremptory strikes against prospective jurors for the purpose of excluding members of a particular race from the jury:

> In order to establish a **Batson** claim, a defendant must establish a *prima facie* case of purposeful discrimination. To do so, a defendant must demonstrate that he/she is of a cognizable racial group; that the prosecution has exercised peremptory challenges to exclude members of that racial group from the panel of venirepersons; and finally, that these facts and any other relevant circumstances raise an inference that the prosecutor used peremptory challenges to exclude venirepersons on the basis of race. Implicit in this scheme is the notion that peremptory challenges constitute a jury selection practice that allows for such discrimination by those who have a design to discriminate. If a defendant succeeds in establishing a *prima facie* case of purposeful discrimination, the prosecution is then required to provide non-discriminatory reasons for striking the potential jurors.

---

[8] The Equal Protection Clause of the Fourteen Amendment to the United States Constitution provides that no state may deny any person within its jurisdiction "the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

*Abu-Jamal*, 720 A.2d at 113–14 (internal citations omitted).

According to Petitioner, McGill's trial notes demonstrate that he engaged in racial discrimination in selecting the jury. We find, however, that the PCRA court did not err in ruling that (a) the claim is barred because of a lack of due diligence in discovering the new evidence, and (b) the claim lacks merit because no constitutional violation is apparent from that evidence.

It is important to note that this is the *third* time that Petitioner has alleged a *Batson* violation. He raised the same issue on direct appeal and in his first PCRA petition in 1995. At both proceedings, our Supreme Court found that Petitioner failed to raise a *prima facie* case of discrimination:

> This court's analysis of this issue on direct appeal indicated that the record reflected that the prosecution employed peremptory challenges to strike eight African–American venirepersons. It now appears, via a stipulation, that there may have been two more African–American venirepersons stricken by the prosecution. That evidence does not alter our original conclusion. Significantly, in concluding on direct appeal that Appellant failed to establish a *prima facie* case of discrimination, we stated: ". . . we have examined the prosecutor's questions and comments during *voir dire,* along with those of the appellant and his counsel, and find not a trace of support for an inference that the use of peremptories was racially motivated." 521 Pa. at 198, 555 A.2d at 850. Even assuming that ten, rather than eight, stricken venirepersons were African–American, we would still arrive at the same resolution of this issue that we did on direct appeal. [Petitioner's] current claim, thus, warrants no relief.

*Commonwealth v. Abu-Jamal*, 720 A.2d 79, 114 (Pa. 1998).

Crucially, McGill was subpoenaed and available to testify at a PCRA hearing in 1995 as to whether he exercised peremptory strikes to exclude

- 19 -

jurors on the basis of race. **See** N.T. PCRA Hearing, 7/18/1995, at 56, 58-59; 7/26/1995, at 222-29; 7/27/1995, at 28-29, 155-56; 8/4/1995, at 117-18. The Commonwealth stated that Petitioner "should be given full latitude" at that hearing to develop his **Batson** claim. N.T. PCRA Hearing, 7/31/1995, at 292. Nevertheless, Petitioner declined to call McGill to the stand and develop his claim. **See** N.T. PCRA hearing, 8/4/1995, 119-20.

Under these circumstances, we are not persuaded that Petitioner exercised due diligence at the relevant times. Had Petitioner questioned McGill in 1995 and asked him in the most general terms about the reasons for his peremptory strikes, then the factual basis of his present claim may have easily been discovered at that point. **See Commonwealth v. Daniels**, 963 A.2d 409, 432-33 (Pa. 2009) (at PCRA hearing on petitioner's **Batson** claim, prosecutor was called about his *voir dire* notes in which the race of jurors was recorded, as well as the reasons why the jurors were stricken). Petitioner's failure to take even that modest step in uncovering the potential evidence of a **Batson** violation in 1995 is therefore fatal to his attempt to resurrect that same issue in 2021.[9]

_____

[9] Petitioner insists that it was not incumbent on him to call McGill to the stand in 1995 because any questions that have could been asked of him were limited in scope to a narrow offer of proof. It follows in Petitioner's reasoning that, since he did not have access to McGill's *voir dire* notes, the PCRA court would have precluded any questions about their contents. We find this reasoning to be unpersuasive. Petitioner asserts that the "only **Batson**-related matter he had notice of to present was the racial makeup of the jury." Appellant's Brief, *(Footnote Continued Next Page)*

- 20 -

But even had Petitioner exercised due diligence, we would still find that, under the circumstances of this case, McGill's *voir dire* notes are not evidence of a **Batson** violation. Indeed, it would have been odd for McGill *not* to have taken such notes under the circumstances.

Before *voir dire* had even begun, Petitioner's counsel had repeatedly raised the issue of discrimination in the jury selection process. Defense counsel alleged that race was a factor in the case because Officer Faulkner was white, and Petitioner was black. Further, counsel asserted that in his experience, Black jurors were routinely stricken by the prosecution due to their race. McGill denied defense counsel's allegation, and the trial judge cautioned defense counsel against shifting the focus of the trial to matters of race rather than the evidence of Petitioner's guilt or innocence. **See** N.T. Trial, 3/18/1982, at 11-16.

As *voir dire* was about to begin, defense counsel asked the trial court if the potential jurors could be prompted to verbally state their race in open court. Defense counsel explained that having them do so would be necessary to perfect the record for appellate review. **See** N.T. Trial, 6/7/1982, at 17-20. The trial court permitted defense counsel to ask potential jurors to identify

_____

at 51. Yet recording the racial makeup of the jury was the only supposed impropriety in McGill's notes. Whether or not Petitioner had those notes in 1995, he would have been able to ask McGill why he struck Black jurors. Moreover, as we detail above, there was nothing unusual or improper about McGill recording the race of potential jurors, especially when defense counsel had preemptively made their race an issue.

their race. Jury selection went forward and, some, but not all of the jurors were asked by defense counsel to state their race verbally on the record.

In context, then, McGill's decision to note the race of prospective jurors does not at all show that he improperly struck any particular venireman from the jury for a discriminatory purpose. Instead, McGill's notations were a logical response to defense counsel's emphasis on that very subject. Defense counsel all but told the prosecution the Commonwealth would need to be prepared to address the issue on appeal.

Our case law is clear that any subsequent post-trial inquiry into the issue of discrimination would hinge on there being a record of (a) the race of all venirepersons in the jury pool; (b) the race of all venirepersons remaining after challenges for cause; (c) the race of those stricken by the prosecutor; and (d) the race of the jurors who served, as well as the race or gender of jurors accepted by the Commonwealth but who were stricken by the defense. *See Commonwealth v. Hill*, 727 A.2d 578, 582 (Pa. Super. 1999) (citing *Commonwealth v. Spence,* 627 A.2d 1176 (Pa. 1993)). Once such a record is established, a court must review it under the totality of the circumstances to determine whether the defendant has made a *prima facie* case of purposeful discrimination. *See Hill*, 727 A.2d at 582 (citing *Commonwealth v. Thomas*, 717 A.2d 468, 475 (Pa. 1998), and *Commonwealth v. Rico*, 711 A.2d 990, 993 (Pa. 1998)).

While McGill's notations should have been disclosed earlier, they do not evidence any improper motivations on his part, much less a violation of the Equal Protection Clause. Noting the race of prospective jurors was an obvious, even necessary, action for McGill to take after defense counsel announced that the race of the jurors would be a factor at the outset of *voir dire*. Thus, we uphold the PCRA's dismissal of the claim without a hearing, as Petitioner failed to carry his burden of raising a question of fact as to whether a **Batson** violation occurred.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/10/2024

- 23 -